[Cite as *State v. Scurlock*, 2017-Ohio-1219.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-15-1200

       Appellee                                   Trial Court No. CR0201402804

v.

James Scurlock                                    **DECISION AND JUDGMENT**

       Appellant                                  Decided:  March 31, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, Brenda J.
Majdalani and Frank H. Spryszak, Assistant Prosecuting
Attorneys, for appellee.

Timothy W. Longacre, for appellant.

* * * * *

**JENSEN, P.J.**

{¶ 1} James Scurlock appeals the judgment of the Lucas County Court of

Common Pleas convicting him of theft from an elderly or disabled adult in violation of

R.C. 2913.02(A)(1) and (B)(3), a felony of the fifth degree.  For the reasons that follow,

we affirm the decision of the trial court.

{¶ 2} On July 13, 2013, Scurlock removed the contents of a safe deposit box he co-leased with his mother, Tina Carroll. Carroll reported to the police that over $350,000 in cash and jewels had been taken by Scurlock, without her permission.

{¶ 3} Scurlock was indicted by the Lucas County Grand Jury on one count of theft from an elderly or disabled adult in violation of R.C. 2913.02(A)(1) and (B)(3), a felony of the second degree. The case was assigned to the Hon. Linda J. Jennings.

{¶ 4} Scurlock entered a plea of not guilty.

{¶ 5} A jury trial commenced on May 12, 2015, before the Hon. Frederick H. McDonald, a retired judge of the Lucas County Court of Common Pleas, sitting by assignment. The following evidence was adduced at trial.

{¶ 6} Tina Carroll suffers from reflex sympathetic dystrophy and is unable to work. Since the mid-1990's she has received permanent total disability benefits from the Social Security Administration. At the time of trial, Carroll was 63 years old and was receiving $1,440 per month in benefits.

{¶ 7} Carroll testified that when her mother passed away in 1998, she inherited $100,000 in cash and approximately $20,000 in savings bonds. Carroll deposited the inheritance in an account at the Toledo Area Catholic Credit Union. A few years later, Carroll opened a safe deposit box at Charter One Bank. Over time, Carroll transferred her inheritance from the credit union account to the Charter One safe deposit box.

2.

{¶ 8} From 2002 through 2007, Carroll was gifted $7,000 annually from her great-aunt Fran for a total of $42,000. Carroll put the money from her great-aunt "under her mattress" in her home.

{¶ 9} At some point in time, Scurlock borrowed $15,000 or $16,000 from Carroll for a down payment on a house. Carroll and Scurlock opened a joint savings account at Huntington Bank so that Scurlock could regularly and conveniently make payments to his mother on the loan. For several months, Scurlock's employer withheld $20 a week from Scurlock's paycheck and deposited it into the joint savings account.

{¶ 10} Upon opening the joint savings account, Huntington Bank offered Carroll and her son a rent-free safe deposit box. Carroll and Scurlock accepted the offer. As co-lessees, they were each issued a key to the box. Over time, Carroll transferred the contents of her Charter One safe deposit box to the box she jointly leased with her son.

{¶ 11} In late-November or early-December 2008, Carroll's home was burglarized and the key to the Huntington safe deposit box was stolen. Carroll was afraid someone would access the box so she asked Scurlock to accompany her to Huntington National Bank. Upon arrival, Carroll and Scurlock entered into a new safe deposit box agreement and moved the contents of the old safe deposit box into a new safe deposit box. Once again, Carroll and Scurlock were each given a key to the box.

{¶ 12} Carroll testified that in late-2009, Scurlock stopped making his weekly loan payments. She also testified that on various occasions Scurlock withdrew money from the joint savings account without her permission. Frustrated, Carroll closed the joint

3.

savings account. Carroll decided that it was necessary to revoke Scurlock's access to the joint safe deposit box. When she asked Scurlock to return his safe deposit box key, Scurlock indicated that he had lost the key.

{¶ 13} In April 2010, Carroll attempted to remove Scurlock as co-lessee from the safe deposit box by filling out a "deputy revocation" form at Huntington Bank. Carroll signed Scurlock's name on the document without his consent. At trial, Carroll testified that when filling out the form, she signed her son's name only because a bank employee instructed her to do so. She asserted that she would never purposely forge an individual's signature on a legal document.

{¶ 14} In September or November of 2012, Carroll placed the $42,000 she received from her great-aunt in the Huntington safe deposit box. She also placed several pieces of jewelry in the box.

{¶ 15} In March 2013, Ms. Carroll underwent surgery at the University of Toledo Medical Center. She experienced complications that resulted in an extended stay at the hospital. While hospitalized, Carroll and Scurlock had a falling out. On April 23, 2013, Scurlock sent his mother a text indicating, "I want nothing more to do with you and I will be cutting off your cellphone today." In May 2013, Carroll's medical condition worsened. Doctors were uncertain whether she would survive. Carroll's deteriorating condition was communicated to Scurlock through family members. Despite her failing health, Scurlock refused to communicate with his mother or visit her in the hospital.

{¶ 16} Carroll's health improved. She was released from the hospital in late-August 2013. On March 10, 2014, Carroll went to Huntington Bank. When the bank employee brought her the safe deposit box signature card, Carroll noticed that someone had signed the card on July 13, 2013. When she opened the safe deposit box, it was empty. Carroll was in shock. Her money and jewelry were gone.

{¶ 17} The next day, Carroll went back to the bank to retrieve a copy of the safe deposit box signature card. From there, she called the police. The original police report indicates $350,000 cash and jewelry were stolen from the safe deposit box. On cross-examination, Carroll indicated that the amount on the report was a "guesstimation." She had "been up for two days" texting her son and trying to figure out why he would take her life savings and jewelry from the safe deposit box.

{¶ 18} After a police report was filed, Scurlock informed his mother that he would return the contents of the safe deposit box. On March 14, 2014, Scurlock's daughter, on behalf of her father, delivered a sealed cardboard box to Carroll. Carroll testified that the cardboard box contained eight envelopes. Each envelope contained cash. On the outside of one envelope was the word "Stephanie" in Carroll's handwriting. The envelope contained $5,000 in $20 bills. Carroll explained that Stephanie is Scurlock's daughter, her oldest grandchild. It total, the cash in the cardboard box was $20 short of $21,000. Carroll removed $20 from her wallet and put it with the box so that the box contained an even $21,000.

5.

{¶ 19} Taking into consideration the amount of money returned to her, Carroll reported to investigating officers that only $329,000 was missing from the safe deposit box. In October 2014, investigating officers again asked Carroll how much money was missing from the box. Carroll indicated that *at least* $177,401 was missing.

{¶ 20} At trial, Carroll denied ever granting Scurlock permission to remove the contents of the safe deposit box. She admitted that she had made a mistake initially in reporting that $350,000 was stolen from the box. Carroll explained that she did not keep an accurate record of the amount of money she placed in the box. She claimed, however, that she was absolutely certain she had placed $100,000 in eight envelopes designated specifically for her grandchildren ($25,000 for each of her four grandchildren). She further claimed that the box contained the $42,000 Carroll had been gifted by her great-aunt Fran, $10,000 she received when her great-aunt passed away, and undetermined amount of additional money Carroll had specifically set aside to purchase a new car.

{¶ 21} Keith Cox is a gaming investigator for the Ohio Casino Control Commission. As a gaming investigator, Cox has access to the business records of the Columbus Hollywood Casino. Cox testified that individuals who gamble at the casino can sign up for a reward card. He offered a brief overview of records associated with the reward card registered to Scurlock. He indicated that Scurlock's win-loss total on game tables for the 24 month period up to and including June 2013—after 219 trips to the casino—was $58,892. The "buy in cash" amount on game tables for the same period was $150,190. Cox explained that the "buy in cash" amount is a recycled dollar amount,

6.

"[s]o if I come in with 20,000 today and I walk even, I come in with the same 20,000 tomorrow, then I'm at 40,000 * * * according to casino records." Cox indicated that Scurlock's win-loss total on slot machines for the 36 month period up to and including January 2015—after 234 trips to the casino—was $17,363. The "buy in cash" amount on slot machines for the same period was $178,498. Cox concluded that Scurlock lost approximately $80,000 from August 2011 through January 2015.

{¶ 22} On cross-examination, Cox explained that it would be easy for an individual to utilize a reward card registered to someone else. He admitted there is no way to know whether the money wagered on Scurlock's reward card was wagered solely by Scurlock.

{¶ 23} Robert Baumgartner is an investigator assigned to the senior protection unit of the Lucas County Prosecutor's office. Baumgartner interviewed Scurlock about the Huntington Bank safe deposit box. According to Baumgartner, Scurlock "found out about the box when he took his mother, the first time, to the hospital and she informed him that there was – here's the key to the box, this is where it's at, if anything happens to me, go get the documents." Scurlock admitted he accessed the box on July 13, 2013. He further admitted that he removed eight envelopes from the safe deposit box and put them in a safe at his home in Columbus, Ohio. Scurlock told Baumgartner that he did not open any of the envelopes and that he returned all of the envelopes, along with the key, at his mother's request.

7.

{¶ 24} Lola Scurlock testified that she has been married to the appellant for ten years. Prior to trial, she and her husband regularly met eight of her relatives at the casino in Columbus. Lola has a player's reward card of her own, but when she goes to the casino with her husband, she uses his card so that they can earn "comps" including free meals. Lola testified that when they go to the casino with family members and friends, "they all try to use one person's card so that [they] can get free dinner at the end of the night."

{¶ 25} Lola Scurlock indicated that she went to Huntington National Bank on July 13, 2013, with her husband to retrieve "documents" out of Carroll's safe deposit box. Lola indicated that the box contained "six or seven envelopes." She never looked inside any of the envelopes.

{¶ 26} The jury returned a verdict finding Scurlock guilty of theft in violation of R.C. 2913.02(A)(1) and (B)(3). The jury further found that Carroll was a "disabled person." The jury was unable to agree on the value of the stolen property. After the verdict was read, Judge McDonald indicated that the matter would be continued for sentencing before Judge Jennings on July 1, 2015.

{¶ 27} At Scurlock's request, the July 1, 2015 sentencing hearing was continued. On July 8, 2015, Scurlock appeared before Judge Jennings for sentencing. She sentenced Scurlock to five years of community control. A restitution hearing was held before Judge Jennings on July 22, 2015. On August 10, 2015, Judge Jennings issued a written order requiring Scurlock to pay restitution to Carroll in the amount of $126,890.99 in regular

8.

monthly payments. Scurlock appealed. On September 10, 2015, we remanded the matter to the trial court for a single revised sentencing entry. The trial court issued a revised sentencing entry on September 24, 2015. It is from this entry that Scurlock now appeals, assigning four errors for our review.

## First Assignment of Error

{¶ 28} In his first assignment of error, Scurlock contends that the gaming investigator's testimony was more prejudicial than probative and should have been excluded under Evid.R. 403(A). Specifically, Scurlock argues that the testimony regarding his casino reward card was "meaningless" and "incredibly misleading." The state retorts that the testimony was relevant to "establish Appellant's motive, plan and intent in committing the theft offense charged."

{¶ 29} Evid.R. 403(A) provides: "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." A trial court has "broad discretion in determining whether unfair prejudice substantially outweighs probative value under Evid.R. 403(A)." *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 171. "A reviewing court will not interfere absent a clear abuse of that discretion." *Id.*

{¶ 30} At trial, Keith Cox explained that casino records reflect a loss on Scurlock's card of approximately $80,000 from January 2012 through February 2015. The state contends that Mr. Cox's testimony was more probative than prejudicial because "$80,000 is a staggering amount to lose" and "[t]he money gambled away had to come

9.

from somewhere." The state argues that "Mr. Cox's testimony tends to establish that Appellant's purpose for the offense was [to] use to his mother's money to fund his and his family's gambling habit."

{¶ 31} There was rebuttal testimony proffered, that once a month eight of Lola Scurlock's family members drove to Columbus to gamble at the casino with the Scurlocks. Lola indicated that when they gambled together they always utilized one person's card so that they would "get free dinner at the end of the night." There is no evidence introduced regarding the income or financial resources of Scurlock, his wife, or the family members and friends who utilized Scurlock's reward card, nor was there any testimony that Scurlock's gambling habit after July 13, 2013, was any different than his habit prior to that date.

{¶ 32} One cannot dispute that evidence of Scurlock's "gambling habit" is prejudicial to his defense. However, Evid.R. 403(A) does not "attempt to bar all prejudicial evidence." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23. Instead, the rule provides that only *unfairly* prejudicial evidence is excludable. *Id*. The Supreme Court of Ohio has described "unfairly prejudicial evidence" as evidence that "might result in an improper basis for a jury decision." *Oberlin v. Akron General Med. Center*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). Evidence may be unfairly prejudicial if it "arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish." *Id.* "Usually, although not always, unfairly prejudicial

10.

evidence appeals to the jury's emotions rather than intellect." *Id.* citing Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3.

{¶ 33} Here, the gaming investigator's testimony was analytic rather than emotive. Rarely does a discussion of business records, casino accounting methods, and an individual's gaming activity elicit a sense of horror or instinct to punish. Cox was forthright about the compounding nature of casino's "recycled dollar" accounting methods to explain how, over a 36-month period, the records show that $178,498 was wagered on Scurlock's card on slot machines, and how, over a 24-month period, the records show $150,190 was wagered on Scurlock's card on game tables.

{¶ 34} On cross-examination, Cox was frank about how easy it would be to utilize another player's reward card:

Q. * * * Is it impossible to have someone else use your card?

A. No.

Q. Happen a lot?

A. I mean, it can happen, easy.

Q. Let's say, if you have a wife and Mr. Scurlock had the card but him and – he and his wife go and used his card, would you be able to differentiate whether he was using the card actually or his wife was using the card?

A. No.

11.

Q. How about if he was using the card or his buddy?

A. No.

Q. So it's plausible that anybody could have used that card?

A. Yes.

Q. Go with a bunch of friends, he wants to build up his points, free lunches?

A. I guess. Those numbers refer to the card.

{¶ 35} While we find little probative value in the proffered evidence, we are not convinced that Cox's analytical testimony aroused the emotional sympathies of the jury. Further, as will be discussed with respect to appellant's second assignment of error, we cannot say that the testimony resulted in an improper basis for a jury decision as there was a substantial amount of credible evidence presented that Scurlock purposefully and wrongfully removed the contents from the subject safe deposit box.

{¶ 36} While the probative value of Cox's testimony was limited, it was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Scurlock's first assignment of error is not well-taken.

## Second Assignment of Error

{¶ 37} In his second assignment of error, Scurlock challenges both the sufficiency and manifest weight of the evidence.

12.

## Sufficiency of the Evidence

{¶ 38} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). To resolve a sufficiency challenge, we must determine, "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 39} Under R.C. 2913.02(a)(1), "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner." Under R.C. 2913.02(B)(3), "if the victim of the offense is [a] * * * disabled adult * * * a violation of this section is theft from a person in a protected class * * *.

{¶ 40} In support of his contention that his conviction was not supported by sufficient evidence, Scurlock argues that there was no evidence that he intended to deprive Carroll of her property because "he was just as much the owner of the safety deposit box, and thereby its contents, as Carroll by virtue of the joint lease agreement for the safety deposit box."

{¶ 41} Sufficient evidence exists that Scurlock, without permission, knowingly exerted control over the contents of the safe deposit box with the purpose of depriving his mother, a disabled adult, of the property. Carroll testified that she inherited $100,000 from her mother and decided to set it aside for her grandchildren's college expenses. She

13.

put cash in eight envelopes. On the outside of each envelope she wrote the name of one of her four grandchildren. She put the envelopes, along with additional money and jewelry in a safe deposit box.

{¶ 42} Carroll testified that she never gave Scurlock permission to take the contents out of the safe deposit box she co-leased with him. In Ohio "[n]o passage of title occurs merely by placing property in a joint safe deposit box." *In re Estate of Lawn*, 90 Ohio Law Abs. 308, 314 (P.C.1962), citing *In re Estate of Copeland*, 74 Ohio App. 164, 58 N.E.2d 64 (4th Dist.1943).

{¶ 43} Scurlock's wife testified that she was with Scurlock when he removed the contents of the safe deposit box. After Carroll discovered the empty box and reported its contents missing to police, Scurlock returned what Scurlock's wife described as everything from inside the box. According to Carroll, however, the cash returned represented only a portion of what had been inside the box. Viewed in a light most favorable to the prosecution, a rational juror could have found the essential elements of theft beyond a reasonable doubt.

### Manifest Weight

{¶ 44} There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. "In considering a manifest-weight claim, the appellate court 'review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury

14.

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Walker*, Slip Opinion No. 2016-Ohio-8295, ¶ 32, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A conviction should be reversed as against the manifest weight of the evidence only in the most exceptional case in which the evidence weighs heavily against the conviction. *See Martin.*

{¶ 45} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984). The trier of fact may take note of any inconsistencies in the evidence and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 46} There are several inconsistences in the record that reflect on the credibility of the testimony proffered. According to investigating officers, Scurlock only found out about the safe deposit box when his mother was first admitted into the hospital.

15.

However, the state produced documents from the bank indicating the safe deposit box was shared by Scurlock and his mother. Further, there was testimony that Scurlock and his mother had a "falling out" while she was hospitalized. Yet, Lola Scurlock testified that she and her husband were doing Carroll "a favor" by holding onto the contents of the safe deposit box. Yet, the Scurlocks failed to extend the favor of visiting Carroll in the hospital when they drove to Toledo from Columbus to remove the contents of the safe deposit box.

{¶ 47} Carroll testified that she set aside equal amounts of money for each of her four grandchildren. Yet, of the monies returned to Carroll, only a portion was earmarked for a grandchild and the grandchild was Scurlock's daughter. Despite Carroll's inability to pinpoint the exact amount of money she had placed in the safe deposit box, the jury found Carroll's testimony more credible than that of Lola Scurlock.

{¶ 48} Upon review of the record, we find that this is not the exceptional case where the evidence weighs heavily against appellant's conviction. Accordingly, the jury did not lose its way in finding Scurlock guilty of the theft offense. Scurlock's second assignment of error is not well-taken.

**Third Assignment of Error**

{¶ 49} In his third assignment of error, Scurlock contends that the trial court erred when it ordered him to pay $126,890.99 in "damages" despite the jury's inability to agree on the monetary value of the stolen property. Scurlock seeks an order remanding the

16.

matter to the trial court for a "finding of zero damages in accordance with the findings of the jury."

{¶ 50} The "damages" referenced by Scurlock in this assignment of error are, in fact, "restitution," a financial sanction imposed by the court as part of a sentence. R.C. 2929.18(A)(1) allows a trial court to order "restitution by the offender to the victim of the offender's crime * * * in an amount based on the victim's economic loss." *See State v. Lowe*, 1st Dist. Hamilton No. C-130048, 2013-Ohio-4224, ¶ 3.

{¶ 51} The Supreme Court of Ohio has held that a trial court choosing to order restitution in a theft case is not restricted to the value corresponding to the level of felony proven at trial. *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 24. Rather, it may award restitution pursuant to R.C. 2929.12(A). *Id.*

{¶ 52} Here, the Lucas County Grand Jury issued a one count indictment alleging Scurlock stole property from a disabled adult and that the value of the property was $37,500, or more, and less than $150,000. At trial, all twelve jurors agreed that theft from a disabled adult occurred. However, the jurors were unable to agree on the value of the stolen property. Ten jurors found the value of the property was identical to the value set forth in the indictment, while two jurors found that the value of the property was $7,500, or more, and less than $37,500. Because the jurors were not able to agree on the value of the theft beyond a reasonable doubt, the court was required to enter a guilty verdict on the lesser included offense.

17.

{¶ 53} The trial court decided to impose restitution. However, the parties were unable to agree on the amount of Carroll's economic loss. Thus, Carroll had the burden to prove, by a preponderance of the evidence, the amount of restitution sought from Scurlock. *State v. Daniels*, 1st Dist. Hamilton, No. C-150042, 2015-Ohio-5348, ¶ 35.

{¶ 54} At the restitution hearing, Carroll described how and when she placed various sums of money in the safe deposit box. She acknowledged she did not know, with certainty, the amount of money in the box on the day her son removed its contents. R.C. 2929.18(A)(1) gives a sentencing court discretion to order restitution but not in an amount greater than the amount of economic loss suffered by the victim as a direct and proximate result of the commission of the offense.

{¶ 55} On August 10, 2015, the trial court issued a written order describing, in detail, how it came to the conclusion that Carroll suffered $126,890.99 in economic loss as a result of the theft. Appellant does not challenge the trial court's calculations. We find no error in the trial court's decision to order restitution in this matter despite the jury's inability to unanimously agree on the value of the stolen property. Scurlock's third assignment of error is not well-taken.

**Fourth Assignment of Error**

{¶ 56} In his fourth assignment of error, Scurlock contends that the trial court erred to his prejudice when the judge who presided over the trial, a retired visiting judge sitting by assignment, did not preside over the sentencing.

18.

{¶ 57} Crim.R. 25(B) states, in pertinent part: "If for any reason the judge before whom the defendant has been tried is unable to perform the duties of the court after a verdict or finding of guilt, another judge designated by the administrative judge * * * may perform those duties. " The Ohio Supreme Court has held that this rule "inferentially commands that unless unable to do so, the judge who presided at a criminal trial must also preside at post-conviction proceedings, including sentencing." *Beatty v. Alston*, 43 Ohio St.2d 126, 127, 330 N.E.2d 921 (1975). However, the Supreme Court has further held that a defendant who fails to timely object to the substitution of a judge waives his right to challenge the reassignment:

> Any party objecting to a reassignment must raise that objection at the first opportunity to do so. If the party has knowledge of the transfer with sufficient time to object before the new judge takes any action, that party waives any objection to the transfer by failing to raise that issue on the record before the action is taken." *State v. Ross* (*In re Cirigliano*), 105 Ohio St.3d 1223, 2004-Ohio-7352, 826 N.E.2d 287, ¶ 26, quoting *Berger v. Berger*, 3 Ohio App.3d 125, 131, 443 N.E.2d 1375 (8th Dist.1981), *overruled on other grounds, Brickman & Sons., Inc. v. National City* Bank, 106 Ohio St.3d. 30, 2005-Ohio-3559, 830 N.E.2d 1151.

{¶ 58} It is undisputed that Judge Frederick McDonald is a retired judge who was assigned by the Chief Justice to preside in the Lucas County Court of Common Pleas for a specific period of time. While assigned to the court, Judge McDonald presided over the

19.

trial of this matter. At the conclusion of the trial, Scurlock raised no objection when Judge McDonald indicated the matter would be transferred back to Judge Jennings' docket for sentencing. Despite ample opportunity prior to sentencing, Scurlock failed to raise the issue on the record. Thus, Scurlock waived his right to challenge the authority of the sentencing judge. Scurlock's fourth assignment of error is not well-taken.

### Conclusion

{¶ 59} For the reasons set forth above, the judgment of the trial court is affirmed. The costs of this appeal are assessed to appellant under App.R. 24. The stay of sentence entered by this court on September 9, 2015 is withdrawn.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____
James D. Jensen, P.J. _____ JUDGE
CONCUR.

_____
JUDGE