[Cite as *State v. Darden*, 2019-Ohio-1175.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No. L-17-1283

       Appellee                                   Trial Court No. CR0201702062

v.

Christopher Darden                          **DECISION AND JUDGMENT**

       Appellant                                  Decided:  March 29, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Christopher Darden, appeals the judgment of the Lucas County Court of Common Pleas, sentencing him to 17 years in prison after a jury found him guilty of rape, domestic violence, and abduction.  Finding no error, we affirm.

## A. Facts and Procedural Background

{¶ 2} On June 22, 2017, a seven-count indictment was filed with the trial court, charging appellant with three counts of rape in violation of R.C. 2907.02(A)(2) and (B), felonies of the first degree, three counts of domestic violence in violation of R.C. 2919.25(A) and (D)(4), felonies of the third degree, and one count of abduction in violation of R.C. 2905.02(A)(2) and (C), a felony of the third degree. One week later, appellant appeared before the trial court and entered pleas of not guilty to the aforementioned charges.

{¶ 3} Following pretrial discovery, a jury trial commenced on November 13, 2017. Prior to trial, the state dismissed four of the seven charges contained in the indictment, leaving only one count each of rape, domestic violence, and abduction. At trial, the following facts were established.

{¶ 4} Appellant and the victim in this case, U.Z., began a relationship after U.Z.'s husband died. At some point, appellant moved into U.Z.'s residence in Toledo, Ohio. Although the relationship started out well, U.Z. testified that appellant became "extremely mentally abusive. Relentless." She went on to testify that appellant would not allow her to use her phone, go outside to check the mail, go to the store by herself, talk to her son, or talk to neighbors. U.Z. stated that, if she failed to comply with appellant's instructions, appellant would beat her by punching her in the face and head, choke her until she became unconscious, and drag her up and down the stairs. U.Z. further stated that appellant would force her to have sex with him, and indicated that any

2.

refusal to do so would result in a beating. When asked why she did not consider running away, U.Z. testified that she was scared of appellant and thought she would die if she tried to run away.

{¶ 5} On June 12, 2017, appellant's ex-girlfriend, L.R., anonymously informed 911 operators that a woman was being held against her will at U.Z.'s residence. Earlier in the night, L.R.'s son was involved in a dispute with appellant concerning a card game. Ultimately, the dispute resulted in appellant ordering L.R. and her son out of U.Z.'s truck, which prompted L.R. to call the police and report the situation at U.Z.'s residence.

{¶ 6} After receiving the call, Toledo police responded to U.Z.'s residence to conduct a safety check. Upon her arrival, Officer Mary Makras observed an individual on the porch and two pit bulls in the front yard. Because the individual was a male and the call was concerning a female, Makras did not approach the residence.

{¶ 7} Later in the day, L.R. made another anonymous report of a woman being held against her will. Makras went back to the residence and knocked on the door. There was no answer.

{¶ 8} The following day, June 13, 2017, Sergeant Peter Lavey was dispatched to U.Z.'s residence to investigate a third report of "an individual being held in the residence against her will being injured by another party." Upon his arrival, Lavey knocked on the door loudly enough that the neighbors came out of their residences. Receiving no response, Lavey departed and resumed his normal duties.

3.

**{¶ 9}** Approximately 15 minutes later, Toledo police received a fourth report of a woman being held against her will inside U.Z.'s residence. Lavey responded to the call along with several other officers, including Makras. As Lavey pulled up to the residence, he observed activity inside the front living room window. Lavey proceeded to knock on the front door "with quite a bit of an authority." Once again, nobody responded to the knocks. Meanwhile, the other officers knocked on the side door and the rear door. There was no response to those knocks.

**{¶ 10}** After receiving no response, and because he had observed activity inside the home, Lavey proceeded to breach the front door. Appellant approached Lavey as he was entering the residence, and asked Lavey what he was doing. Lavey inquired as to why appellant failed to respond to his knocks, and appellant indicated that he was sleeping. Lavey then took appellant into custody.

**{¶ 11}** As they were clearing the residence, officers discovered U.Z. According to Lavey, U.Z. was "very shaken, scared, low – her voice was very – very timid, low, I would say actually terrified." In terms of U.Z.'s physical condition, Lavey testified that she appeared "very bruised" and presented with blood on her face.

**{¶ 12}** Lavey asked U.Z. why she did not answer the door when he knocked. U.Z. responded that although she heard the knocks, appellant would not permit her to answer the door. Similarly, U.Z.'s 26-year-old son informed Lavey that appellant had prevented him from answering the door. U.Z. testified that she believed appellant would kill her if she defied his orders and answered the door.

4.

{¶ 13} Upon further questioning, U.Z. informed Makras that appellant held her inside the residence for several days and raped her several times. Makras observed "numerous marks and bruises and scrapes all over [U.Z.'s] body, her arms and her legs and her back." U.Z. was subsequently taken to the hospital for further examination.

{¶ 14} At the hospital, U.Z. was examined by a sexual assault nurse, Janis Karam. At trial, Karam testified that U.Z. was "very upset" when she arrived at the hospital. U.Z. was crying and rocking back and forth in the bed. U.Z. informed Karam that she had been held in her home and not allowed to leave for three days, during which time she was beaten, raped, and burned. Karam conducted a physical examination and performed a rape kit. During the physical examination, Karam photographed U.Z.'s injuries, which were consistent with U.Z.'s statements. These photographs were introduced into evidence at trial.

{¶ 15} At some point during her hospital visit, U.Z. was interviewed by Detective Mark Nelson of the Toledo Police Department. During the interview, U.Z. informed Nelson that appellant had beaten her and burned her with a bread knife and a cigarette. She recounted an incident in which appellant pulled her outside of the residence, beat her in front of the neighbors, and dragged her back inside. Regarding the allegations of rape, U.Z. informed Nelson that appellant would usually "just point or say come on, bitch, let's go. We're going to have sex." U.Z. informed Nelson that appellant's abuse "went on for months at a time [with] all these beatings and if [U.Z.] did not do what [appellant] told her to do, he would beat her."

5.

{¶ 16} Concerning the events that transpired on the morning of June 13, 2017, U.Z. testified that appellant was yelling and upset. At some point, appellant inexplicably became quiet and started making advances on U.Z. U.Z. explained that she tried to ignore the advances, but appellant was insistent. U.Z. stated, "I looked at him, he looked at me, and he said let's go. You know what it is. He was – he had an erection. It was – that was it. It was time to go upstairs. So I went upstairs." U.Z. explained that "let's go" meant that appellant wanted to have sex. U.Z. testified that she did not want to have sex with appellant, but she was too scared to verbalize any objection. U.Z. went upstairs, where appellant climbed on top of her. U.Z. stated that she tried to stall the process because she knew the police would be coming back to the residence. However, appellant grabbed her by the neck and forced her to have intercourse with him. U.Z. went on to state that appellant's penis penetrated her vagina and that it was unwanted.

{¶ 17} Following the presentation of the state's evidence, appellant's trial counsel moved for acquittal under Crim.R. 29. The trial court denied the motion, and appellant proceeded to his case-in-chief. For his defense, appellant presented the testimony of two witnesses, L.R. and his son, D.D.

{¶ 18} During her testimony, L.R. explained that she fabricated her June 12 and 13, 2017 reports to 911 operators because she was "hurt and mad and disappointed" with appellant for directing her and her son out of U.Z.'s truck on the evening of June 12, 2017. Both L.R. and D.D. stated that they never observed appellant act aggressively or

6.

violently with U.Z., or hold her against her will. Further, L.R. stated that she occasionally conversed with U.Z. about appellant. According to L.R.,

> [U.Z.] never [reported appellant] abusing her, hitting her, holding her hostage, raping her against her will. She never reached out and said none of that sort. It was always, um, Chris [is] a good guy, she love[s] him, she [is] in love with him, she actually wanted him to leave me alone to be with her. She was basically jealous. And it showed a whole bunch.

{¶ 19} After L.R. and D.D. testified, appellant decided to take the stand. For his part, appellant denied having any nonconsensual sexual activity with U.Z. Further, appellant testified that he was not holding U.Z. against her will. On the contrary, appellant indicated that U.Z. had her own mobile phone and had access to her vehicle.

{¶ 20} Appellant testified that he heard officers knocking on the door on June 13, 2017. Appellant explained that he and U.Z. did not want to answer the door because they both had active warrants. He acknowledged having sexual intercourse with U.Z. on the morning of June 13, 2017, but stated that U.Z. initiated the intercourse. Appellant reasoned that U.Z. wanted to have sex because "she was thinking * * * of the prior night of me and [L.R.] walking with the dogs that I was going back to [L.R.]. That was her whole manner."

{¶ 21} At the conclusion of appellant's testimony, the trial court instructed the jury and the parties presented their closing arguments. After deliberating, the jury found appellant guilty of rape, domestic violence, and abduction. The trial court proceeded

7.

immediately to sentencing, and imposed prison terms of 11 years for rape, 36 months for domestic violence, and 36 months for abduction. The court then ordered the sentences served consecutively for a total prison term of 17 years.

{¶ 22} Following sentencing, appellant filed a timely notice of appeal.

### B. Assignments of Error

{¶ 23} On appeal, appellant assigns the following errors for our review:

I. The trial court erred in denying Appellant's Crim.R. 29 motion.

II. The jury's verdict was against the manifest weight of the evidence presented at trial.

### II. Analysis

{¶ 24} In appellant's first assignment of error, he contends that the trial court erred in denying his motion for acquittal under Crim.R. 29 as to the charges of rape and abduction.[1] In his second assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence. Because these arguments are interrelated, we will address them together.

{¶ 25} A motion for acquittal under Crim.R. 29(A) is a challenge to the sufficiency of the evidence. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported

---

[1] In his brief, appellant acknowledges his guilt as to the charge of domestic violence.

8.

by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 26} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 27} In contrast, when reviewing a manifest weight of the evidence issue, we sit as a "thirteenth juror." *Id.* at 387. That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 28} Here, appellant was convicted of rape under R.C. 2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the offender

9.

purposely compels the other person to submit by force or threat of force." Further, appellant was convicted of abduction under R.C. 2905.02(A)(2), which states:

(A) No person, without privilege to do so, shall knowingly do any of the following:

(2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear.

{¶ 29} Here, appellant argues that he did not compel U.Z. to submit to sexual conduct by force or threat of force but, rather, that the sexual intercourse he had with U.Z. on the morning of June 13, 2017, was consensual. Moreover, appellant argues that he did not restrain U.Z.'s liberty by force or threat of force.

{¶ 30} As to the rape that occurred on June 13, 2017, U.Z. testified that appellant directed her to go upstairs to have sexual intercourse with him. She testified further that she did not want to have sex with appellant, but was too scared to verbalize any objection based upon the beatings she had previously received. U.Z. attempted to delay the intercourse, angering appellant and causing him to grab her by the neck and force her to comply. U.Z. went on to confirm that appellant penetrated her against her will.

{¶ 31} U.Z.'s testimony concerning the rape was consistent with the statements she provided to Nelson and Karam. Further, U.Z.'s testimony concerning appellant's physical abuse was consistent with Karam's physical examination and the photographs that are part of the record.

10.

{¶ 32} Relevant to the abduction charge, U.Z. testified that appellant would not allow her to go outside or go to the store by herself. U.Z. believed that appellant would kill her if she tried to leave without him. Prior to appellant's arrest, L.R. reported to police on four separate occasions that U.Z. was being held against her will. L.R.'s report was corroborated by U.Z., who informed Makras and Karam that appellant had held her inside the residence for several days and raped her several times. U.Z. testified that appellant ordered her to go upstairs and directed her not to answer the door when police knocked on the door. U.Z. testified that she believed appellant would kill her if she defied his orders and answered the door. U.Z. appeared to be terrified and was observed with numerous injuries following her rescue, which further supports her claim that she was being held against her will.

{¶ 33} The foregoing testimony is sufficient to establish that appellant restrained U.Z. and compelled her to have sexual intercourse by force.

{¶ 34} In his brief, appellant cites U.Z.'s testimony that she did not resist or refuse appellant's sexual advances. In addition, appellant points out that U.Z. took off her pants prior to intercourse, and verbalized no objections during intercourse. However, U.Z. explained at trial that any refusal to have sex with appellant would result in her being beaten, and sometimes even choked until she became unconscious. As a result, U.Z. believed that she had no option but to comply with appellant's advances.

{¶ 35} Appellant further argues that U.Z.'s testimony is not credible considering the fact that she failed to call the police to report the abuse despite having access to a

11.

mobile phone, and failed to escape the residence despite having access to her vehicle. Relevant here, U.Z. testified that appellant would not allow her to use her phone or her vehicle. Indeed, U.Z. stated that appellant would not even allow her to go outside to check the mail, go to the store by herself, talk to her son, or talk to neighbors. When asked why she did not consider an escape, U.Z. testified that she was scared of appellant and thought she would die if she tried to run away.

{¶ 36} In light of the foregoing, we find that the state introduced ample evidence to establish that appellant restrained U.Z.'s liberty and compelled her to submit to sexual conduct by force or threat of force. Appellant's systematic physical abuse of U.Z. is evident from the record, and supports U.Z.'s testimony that noncompliance with appellant's demands was not an option. Thus, we find that the rape and abduction convictions are supported by sufficient evidence.

{¶ 37} As to manifest weight, appellant takes issue with the jury "totally discount[ing] his testimony, as well as the testimony of his witnesses: L.R. and D.D." Importantly, we have previously held that "[t]he jury may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all, part, or none of a witness's testimony.'" *State v. Scurlock*, 6th Dist. Lucas No. L-15-1200, 2017-Ohio-1219, ¶ 45, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. Therefore, to the extent that appellant is correct in his assumption that the jury did not believe his testimony, or that of his witnesses, we do not find that to be a sufficient basis

12.

to reverse on manifest weight grounds. That is particularly true in this case, where the evidence strongly supports the charges of rape and abduction.

{¶ 38} In light of the foregoing, we find that this is not the exceptional case in which the evidence weighs heavily against the convictions. Thus, we find that appellant's convictions for rape and abduction are not against the manifest weight of the evidence. Having also concluded that appellant's convictions for rape and abduction were supported by sufficient evidence, we find appellant's assignments of error not well-taken.

### III. Conclusion

{¶ 39} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
              JUDGE
Christine E. Mayle, P.J.

Gene A. Zmuda, J.       _____
CONCUR.            JUDGE

            _____
              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.