[Cite as *State v. Young*, 2020-Ohio-4943.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No. L-19-1189

      Appellee                                     Trial Court No. CR0201901089

v.

Nicole L. Young                                       **DECISION AND JUDGMENT**

      Appellant                                   Decided:  October 16, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Drew E. Wood, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Defendant-appellant, Nicole L. Young, appeals the August 16, 2019 judgment of the Lucas County Court of Common Pleas, convicting her of theft and ordering restitution to the victim of $49,014.  For the following reasons, we affirm the trial court judgment; however, we remand this matter to the trial court to enter a nunc pro

tunc judgment correcting the amount of restitution to $49,114, as calculated in the court's August 7, 2019 order.

## I. Background

{¶ 2} The victim in this case, J.P., is a 50-year-old woman who was born with cerebral palsy. She is employed as a college-level English instructor, but she has physical limitations, rendering her in need of assistance with such things as transportation, household chores, errands, and some personal care. In 2014, J.P. advertised for a caregiver on her church Facebook page. Nicole Young responded, and J.P. hired her.

{¶ 3} J.P. orally agreed to pay Young $200 per week. Once a week, she and Young went to an ATM so J.P. could withdraw cash to pay Young. Because it was difficult for J.P.—who is wheelchair bound—to reach the machine and make the withdrawal herself, she would give Young her bank card and personal identification number ("PIN"), and Young would make the withdrawal for her. J.P. would ask Young to withdraw $300—she gave $200 to Young and kept $100 for spending money. Of that $100 spending money, J.P. paid $60 a week to a woman who cleaned her house. J.P.'s other bills and expenses were paid either electronically or via credit card. J.P. did most of her shopping on Amazon and other websites, and for some period of time, she used a grocery delivery service.

{¶ 4} As J.P. grew to trust Young, she would allow Young to take her bank card and go to the ATM by herself to make the weekly $300 withdrawal. Young would give

2.

J.P. the cash and the receipt, and J.P. would give $200 to Young. Perhaps once or twice a month, J.P. may have needed additional cash for such things as dinner, trips to the movies with friends, or for very infrequent travel—she estimated that she went on weekend trips no more than three or four times over the four-year period she employed Young. Young was the only person who had access to J.P.'s bank card and PIN.

{¶ 5} In March of 2018, J.P. suffered a depressive episode for which she took a three-month leave of absence from work. She became very weak and her health declined to the point that she could no longer live independently. In July of 2018, she was admitted to a rehabilitation center and prepared to move into an assisted living facility. At this point, she no longer required Young's services.

{¶ 6} In preparation for moving into an assisted living facility, J.P.'s brother and niece reviewed her finances to determine how she would pay her living expenses. They brought to her attention that the balance in her bank account was much lower than it should have been, and they noticed numerous suspicious ATM withdrawals. J.P.'s niece reviewed her monthly bank statements line-by-line and discovered that cash was being withdrawn far more frequently than once a week. She flagged the suspicious transactions on the bank statements, and J.P. reviewed them to determine which transactions were authorized and which were not.

{¶ 7} J.P. contacted the Oregon police department. Young was questioned and admitted to stealing money from J.P. The Oregon police also brought to J.P.'s attention

3.

additional suspicious use of her bank card for the purchase of such things as groceries and Halloween costumes.

{¶ 8} Young was indicted on January 17, 2019, on one count of theft from a person in a protected class, a violation of R.C. 2913.02(A)(2) and (B)(3), a felony of the second degree. On June 3, 2019, Young entered a plea of guilty to the lesser included offense of theft, a violation of R.C. 2913.02(A)(2) and (B)(2), a felony of the fourth degree. The trial court requested a presentence investigation report and continued the matter for a restitution hearing, which took place on August 5, 2019.

{¶ 9} On August 7, 2019, the trial court issued a detailed order, concluding that J.P.'s economic loss was proven to be $49,114. The matter proceeded to sentencing on August 15, 2019, at which time it sentenced Young to three years' community control and ordered her to pay restitution to the victim of $49,014.[1] Young's conviction and sentence were memorialized in a judgment journalized on August 16, 2019.

{¶ 10} Young appealed. She assigns the following errors for our review:

> I. The trial court abused its discretion when it ordered restitution based on indefinite information, and did not provide a detailed explanation of the basis for its decision.

---

[1] The state made a $100 mathematical error in one of the exhibits admitted at the restitution hearing. This error was acknowledged at the hearing, and the trial court took it into account in its August 7, 2019 order when it found economic loss of $49,114. But it appears that this was overlooked in its August 16, 2019 judgment. This error can be corrected in a nunc pro tunc entry.

4.

II. The restitution ordered by the court was based on insufficient evidence, and/or was against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 11} Young raises two assignments of error, in essence asking us to review the trial court's restitution order under three separate standards of review: abuse of discretion, sufficiency of the evidence, and manifest weight of the evidence. We begin by clarifying that "the proper standard of review for analyzing the imposition of restitution as a part of a felony sentence is whether the sentence complies with R.C. 2953.08(G)(2)(b)." *State v. Collins*, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 31 (12th Dist.). This means that "in reviewing the order for restitution, we must determine whether the restitution imposed was contrary to law, rather than reviewing for an abuse of discretion." *State v. Cantrill*, 6th Dist. Lucas No. L-18-1047, 2020-Ohio-1235, ¶ 87; *State v. Becraft*, 2017-Ohio-1464, 89 N.E.3d 218, ¶ 19 (2d Dist.) ("[I]nstead of applying an abuse of discretion standard, * * * the proper standard of review for analyzing the imposition of restitution as a part of a felony sentence is whether * * * it is clearly and convincingly contrary to law.").

{¶ 12} Under R.C. 2929.18(A)(1), a "court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and

5.

proximate result of the commission of the offense."  If the offender, victim, or survivor disputes the amount of restitution, the court must hold a hearing.  *Id.*  At the restitution hearing, the victim bears the burden of proving by a preponderance of the evidence the amount of economic loss attributable to the offender's conduct.  *State v. Isaacs*, 2d Dist. Montgomery No. 27414, 2017-Ohio-7637, ¶ 10.  *See also State v. Scurlock*, 6th Dist. Lucas No. L-15-1200, 2017-Ohio-1219, ¶ 53 (recognizing that victim bears burden to prove, by a preponderance of the evidence, the amount of restitution to which he or she is entitled).  The offender must be permitted to cross-examine witnesses concerning the amount of restitution sought.  *State v. Benko*, 9th Dist. Lorain No. 18CA011388, 2019-Ohio-3968, ¶ 10.

{¶ 13} "To be a lawful order, the amount of the restitution must be supported by competent, credible evidence from which the court can discern the amount of the restitution to a reasonable degree of certainty."  (Internal citations and quotations omitted.")  *State v. Wright*, 6th Dist. Lucas No. L-17-1242, 2018-Ohio-2599, ¶ 18.  The victim's loss may be supported through documentary evidence or testimony, including that of the victim.  *Collins* at ¶ 33.  The victim's testimony alone may be sufficient to establish his or her economic loss.  *Benko* at ¶ 10.

{¶ 14} Because Young advances the same arguments in support of both assignments of error—simply tailoring her arguments based on the various erroneous standards of review she asserts—we will address both assignments together under the proper standard.

6.

## A. The state presented testimony and documentary evidence in support of J.P.'s economic loss.

{¶ 15} At the restitution hearing, the trial court heard testimony from J.P., Young, and R.F.—Young's neighbor who helped care for J.P. to some degree when Young was suffering from a hernia. Additionally, the state offered into evidence J.P.'s itemized monthly bank statements (Exhibits 1-4) and a spreadsheet summarizing authorized and unauthorized withdrawals made from J.P.'s accounts during 2016, 2017, and 2018 (Exhibit 5).

{¶ 16} At the hearing, J.P. provided the information summarized above in the background section. She also went through her bank statements month-by-month and explained which withdrawals she deemed "authorized," which she deemed "unauthorized," and her reasons for characterizing them as such.

{¶ 17} J.P. testified that the first unauthorized withdrawal occurred in February of 2016, approximately two years after Young's employment began. While J.P. conceded that she could not be absolutely certain which transactions were authorized and which were unauthorized, she described the method she used for identifying the unauthorized transactions. Briefly stated, J.P. assumed that one weekly withdrawal of $300 was authorized. Generally, where more than one withdrawal occurred in a day or when multiple withdrawals took place very close in time, she deemed those withdrawals unauthorized. Because she acknowledged that she may at times have needed more cash during any given month, she allowed for at least one additional cash withdrawal as being

7.

potentially "authorized." Also, the majority of the withdrawals were in increments of $200 or $300; where a smaller amount was withdrawn, she assumed it was authorized. J.P. noted that her card had been used at grocery stores in amounts that far exceeded her usual grocery store spending, but she did not seek restitution for those charges. And where she was unsure whether a withdrawal was authorized or unauthorized, she gave Young the benefit of the doubt. She insisted that she had not asked for restitution in an amount greater than what Young stole from her.

{¶ 18} The exhibits admitted by the state showed that when Young first began stealing from J.P. in 2016, there were months where no unauthorized withdrawals occurred. Where there were unauthorized withdrawals in 2016, they ranged from $200 to $1,500 per month. In 2017, there was one month with no unauthorized withdrawals. The remainder of the year, the monthly unauthorized withdrawals ranged from $900 to $3,800 per month. And in 2018, there were unauthorized withdrawals every month, ranging from $2,100 to $3,600 per month. J.P. could think of no reason that she would need this much extra money in a month.

{¶ 19} Significantly, J.P. testified that during her three-month depressive episode that started in March of 2018, she rarely left the house; she mainly stayed home watching television or staring at the wall. Nonetheless, $300 withdrawals were being made numerous times a week, totaling anywhere from $2,400 to $3,600 per month.

{¶ 20} Young testified that while she has no idea how much money she stole from J.P., she did not steal the amount claimed. She maintained that by 2016, J.P. had

8.

increased her compensation to $300 per week instead of $200—an assertion that J.P. denied. Young also claimed that she suffered from a hernia that ultimately required surgery, and for "a good solid year," her neighbor, R.F., assisted in J.P.'s care. Young insisted that J.P. agreed to pay R.F. $50 per day approximately four days a week during that time, totaling $10,400. J.P. agreed that R.F. helped care for her "a couple of times" and was paid, but it was not on a regular basis—it was occasional.

{¶ 21} Young also claimed that she shopped for groceries for J.P. and paid cash. She estimated paying $500 to $800 per month in cash for J.P.'s groceries. She conceded that for some period of time, J.P. had a grocery service, and J.P.'s bank statements showed some grocery purchases on her bank card. In fact, J.P.'s bank statements showed grocery purchases every month except one for the period of January of 2017, until Young's termination. And contrary to Young's testimony, J.P. testified that she only "occasionally" paid cash for groceries.

{¶ 22} R.F. testified that about a year and one-half ago, Young asked her if she wanted to go to work with her. R.F. said she would. For the most part, she did not help care for J.P.—"[Young] did it kind of on her own"; R.F. "was just kind of there." Sometimes R.F. would help Young transfer J.P. from the car into her wheelchair or help take off her shoes and put them away. She gave J.P. a shower during her depressive episode. And she sometimes helped shop for J.P.; she claimed that when she did, groceries were paid for in cash. R.F. explained that while recovering from hernia surgery, Young still went to J.P.'s home, but R.F. just did more than she usually did.

9.

R.F. did this for about a year and was paid roughly $200 per week. She never spoke with J.P. about being compensated—she spoke with Young who said she would talk to J.P. about it. R.F. was never paid directly by J.P.—she was paid by Young.

**B. The trial court issued a detailed decision explaining its restitution order.**

{¶ 23} The trial court issued a detailed order on August 7, 2019, summarizing the evidence and making numerous findings of fact and assessments of the witnesses' credibility. It observed that J.P.'s testimony was "cogent, credible, and frank," and she admitted when she did not know an answer with certainty. The court found that it was more likely than not that J.P.'s figures were true. She "was able to identify by use of the bank records which withdrawals were for [Young's] compensation, and gave [Young] the benefit of the doubt on various monthly withdrawals."

{¶ 24} The court explained that it had granted "little weight" to Young's testimony, and it specifically rejected Young's claim that by 2016, J.P. agreed to pay her $300 per week. The court found that J.P. had rebutted this assertion. It emphasized that Young offered no basis for establishing and calculating the amount that she stole from J.P., whereas J.P. was able to identify these amounts based on bank records.

{¶ 25} Additionally, the court said that it had attributed "little weight" to R.F.'s testimony. It found that the $200 per week that R.F. received was the same $200 per week that J.P. testified was the agreed-upon compensation for her caregiver, and it observed that R.F. had admitted that *Young* always paid her. In other words, the trial

court did not believe that J.P. agreed to pay two caregivers when Young was unable to work.

{¶ 26} The court concluded that J.P.'s economic loss was $49,114—$49,104 as reflected in the state's amended Exhibit 5, plus $10 for ATM fees that were not included in Exhibit 5 but which appeared in the bank statements.

### C. The trial court's restitution award is not clearly and convincingly contrary to law.

{¶ 27} Young argues that the court's restitution award should be reduced because J.P.'s economic loss was unclear and was not proven by a preponderance of the evidence. She maintains that (1) the court should have accepted Young's claim that her compensation was increased to $300 per week in 2016, which, for 124 weeks, would have reduced J.P.'s economic loss by $12,400; (2) the court should have subtracted out R.F.'s compensation of $200 per week for a year, which would have reduced the economic loss by another $10,400; (3) the court should have assigned weight to Young's testimony that J.P. paid $75 per week in cash for gas and groceries, totaling $9,300 over a period of 124 months[2]; and (4) the court should have excluded from the restitution amount the $60 per week that J.P. paid in cash to her house cleaner, totaling $7,400 over a period of 124 months. Young claims that the trial court's decision "does not describe in detail how it came to its conclusion as [to] the amount of [J.P.'s] losses." She insists that

---

[2] Young did not testify to this; this assertion was made in her sentencing memorandum.

11.

the court simply accepted the calculations from the state's Exhibit 5 "without addressing the disputed evidence," and "did not explain what evidence [it] found persuasive."

{¶ 28} In calculating a victim's economic loss, "[t]he reliability of the evidence and the credibility of the witnesses is for the trial court, as trier of fact, to determine." *Isaacs*, 2d Dist. Montgomery No. 27414, 2017-Ohio-7637, at ¶ 10. The trial court need not "itemize or otherwise explain how it arrived at the amount of restitution it orders, so long as the trial court can discern the amount of restitution to a reasonable degree of certainty from competent, credible evidence in the record." (Internal citations and quotations omitted.) *State v. Patton*, 4th Dist. Highland No. 18CA9, 2019-Ohio-2769, ¶ 26.

{¶ 29} Here, despite Young's arguments to the contrary, the trial court fully explained how it calculated restitution, and it made specific credibility determinations that further explained the rationale for its award. In arguing that the court did not describe its award in detail and did not address the disputed evidence, it appears that Young has overlooked the trial court's August 7, 2019 order where it did just that—described its award in detail and addressed the disputed evidence.

{¶ 30} The court specifically explained that it believed J.P.—not Young—with respect to the amount of Young's compensation. It rejected Young's claim that J.P. agreed to pay R.F. $200 per week for a year *on top of* Young's compensation. The court believed J.P.'s testimony that her cleaning person was paid $60 per week from her $100 spending money that she withdrew each week. And even Young conceded at the hearing

12.

that there was no reliable way for her to estimate how much cash she spent on groceries for J.P.—J.P. had a grocery service for some period of time and Young acknowledged that she sometimes used a bank card for J.P.'s groceries. In fact, the bank statements show monthly grocery store purchases for 11 out of 12 months in 2017, and every month in 2018, ranging from $125 to $1,400 per month.

{¶ 31} In *Scurlock*, we upheld the amount of a restitution award despite the fact that the victim "did not know, with certainty, the amount of money in the [safe deposit] box on the day [the defendant] removed its contents." *State v. Scurlock*, 6th Dist. Lucas No. L-15-1200, 2017-Ohio-1219, ¶ 54. Here, too, J.P. could not say with certainty how much Young stole from her, but she was certain that she had not overestimated the amount and, in fact, had likely underestimated it. Moreover, the trial court—which had the benefit of seeing the witnesses testify—made clear that it did not believe Young or R.F. Accordingly, we find that its restitution award was supported by competent, credible evidence, J.P.'s economic loss was proven by a preponderance of the evidence, and the restitution award was not clearly and convincingly contrary to law.

{¶ 32} We find Young's two assignments of error not well-taken.

### III. Conclusion

{¶ 33} Young's two assignments of error misstate the applicable standard of review. Reviewing her arguments under the proper standard—R.C. 2953.08(G)(2)(b)—we find that the trial court's restitution award was not clearly and convincingly contrary to law. The victim's economic loss was proven by a preponderance of the evidence

based on her testimony and supporting bank statements, and the court's findings were supported by competent, credible evidence. We find Young's assignments of error not well-taken.

{¶ 34} We affirm the August 16, 2019 judgment of the Lucas County Court of Common Pleas, but we remand this matter to the trial court so that the court may enter a nunc pro tunc judgment correcting the amount of restitution to $49,114, as reflected in its August 7, 2019 order. Young is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.