[Cite as *State v. Schmelmer*, 2022-Ohio-57.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | **JUDGES:** |
|  | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2020 CAA 11 0049 |
| ERIK M. SCHMELMER | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Criminal appeal from the Delaware County
Court of Common Pleas, Case No. 18 CR I
05 0310

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     January 10, 2022

APPEARANCES:

For Plaintiff-Appellee     For Defendant-Appellant

MELISSA A. SCHIFFEL     STEPHEN E. PALMER
PROSECUTING ATTORNEY     YAVITCH & PALMER
JOEL C. WALKER     511 South High Street
ASSISTANT PROSECUTOR     Columbus, Ohio  43215
145 South Union Street, 3rd Floor
Delaware, Ohio  43015

*Wise, J.,*

{¶1}  Appellant Erik Schmelmer appeals his conviction on one count of Rape and one count of Kidnapping, entered in the Delaware County Court of Common Pleas following a trial to the bench.

{¶2}  Appellee is the state of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶3}  The relevant facts and procedural history are as follows:

{¶4}  On July 27, 2018, the Delaware County Grand Jury returned an indictment charging Appellant Erik K. Schmelmer with one count of Rape, in violation of R.C. §2907.02, and one count of Kidnapping, in violation of R.C. §2905.01, both first degree felonies. Schmelmer entered pleas of not guilty.

{¶5}  On February 12, 2019, the State filed the first of several motions *in limine* seeking to exclude defense witnesses, testimony and/or evidence under Ohio's Rape Shield law and various Rules of Evidence.

{¶6}  On February 13, 2019, the trial court convened for a hearing on the State's Motion. Appellant proffered details regarding expected evidence and witness testimony.

{¶7}  On February 15, 2019, the trial court filed a judgment entry partially granting and partially denying the State's Motion. The court later filed an amended entry on February 19, 2019.

{¶8}  The State appealed, seeking interlocutory review of the trial court's decision. Finding that the decision was not a final appealable order, this Court dismissed the appeal and remanded the matter back to the trial court. *State v. Schmelmer,* Case Number 19 CAA 02 0013.

**{¶9}** The State filed additional motions *in limine*, raising similar evidentiary challenges.

**{¶10}** On September 4, 2020, the trial court issued another written decision on the new motions.

**{¶11}** Appellant waived his right to trial by jury, and the case proceeded to a bench trial on October 6, 2020.

**{¶12}** At trial, the court heard the following testimony:

**{¶13}** The victim, L.P., testified that on the date of the incident, she was 20 years old. (T. at 79). She explained that she competed in beauty pageants during her teenage years, and that after winning a pageant in 2016, she was awarded a fitness coach in preparation for the Miss Ohio pageant. (T. at 81-82). That fitness coach was Keri Schmelmer. *Id.* L.P. testified that she became good friends with Keri and her children. *Id.* L.P. further testified that it was her understanding that Keri and Appellant were divorced but were still living together for financial reasons. (T. at 85). L.P. testified that prior to May 24, 2018, she had only met Appellant one time, back in 2017. (T. at 84).

**{¶14}** L.P. testified that in September, 2017, she became engaged and moved to Tulsa, Oklahoma. (T. at 89). The wedding date was set for June 10, 2018, in New Albany, Ohio. (T. at 90). L.P. stated that she flew to Ohio on May 14, 2018, to meet with wedding venders and to attend a fundraising event for Keri's daughter. (T. at 94-96). She recalled that she drove herself to the barn on May 24, 2018, around 6:00 P.M., and that she helped to set-up the event and sold raffle tickets (T. at 104, 110). She further recalled that she had a vodka drink around 7:00 pm. and she started to feel the effects between

8:00 and 8:30 pm. (T. at 116). She testified that she also drank water during that period and was never out of control. *Id.*

{¶15} L.P. stated that most of the attendees left around 10:00 P.M. (T. at 129). She stated that the only people remaining at the event that she knew were Keri and Appellant. *Id.* L.P. testified she was approached by several of Appellant's friends who flirted with her. (T. at 126). One friend in particular, Demetrius, made several unwanted advances. (T. at 126-127).

{¶16} Around 11:30 P.M. Appellant and Keri got into a verbal argument. (T. at 132-133). Keri texted L.P. to come outside around 11:45 P.M. *Id.* L.P. observed Appellant leaning into Keri's car in an attempt to stop her from leaving. *Id.* Keri drove off shortly thereafter. *Id.*

{¶17} Upon returning to the barn, Demetrius asked for L.P.'s phone number. (T. at 138). L.P. testified Demetrius told her that he would call the number right away to ensure she didn't give him a fake number. *Id.*

{¶18} At approximately midnight L.P. recalled cocaine being distributed to several people around the bar area. (T. at 140). L.P. stated that she had never seen cocaine prior to that night. (T. at 141). L.P. testified that she observed Appellant using cocaine at the bar area. (T. at 142). L.P. testified that she did not use any cocaine. (T. at 143).

{¶19} L.P. explained that she felt scared and overwhelmed. *Id.* She recalled that she was cold and her teeth were chattering. (T. at 144). At this point, Appellant approached her and offered her a blanket from the loft area. (T. at 146). L.P. testified she was happy to leave the cocaine and the bar area so she followed Appellant up to the loft around 12:15 to 1:220 A.M. (T. at 146-147). Once they were at the top of the

stairs, L.P. testified Appellant began to forcibly kiss her. (T. at 152-153). L.P. stated that Appellant then swung her around and pushed her into a chair. (T. at 154-155). L.P. testified her back was flat on the seat of the chair with her head against the back rest. (T. at 156). Appellant was chest to chest with L.P. and between her legs. (T. at 157). L.P. testified no oral sex was performed by either person. (T. at 158). She stated that Appellant stood up, took down his pants, then resumed his position on top of her, with his left hand pressing down on her shoulder. (T. at 159-160). L.P. testified that she said "No" numerous times. (T. at 161). Appellant attempted to move L.P.' s underwear and insert his penis into her vagina. (T. at 162). L.P. stated that he was not successful at first and that he then spit in his hand and used the saliva for lubrication. (T. at 163). L.P. testified she was not aroused and was not lubricated. *Id.* L.P. recalled Appellant's attempts to penetrate her as being painful. (T. at 164). Appellant was eventually able to penetrate L.P.'s vagina. (T. at 163-164). L.P. continued to say "No" during the assault. *Id.* Appellant's left hand and arm remained on L.P.'s shoulder and chest during the course of the assault. (T. at 165). After a few minutes, Appellant ejaculated inside of L.P.'s vagina, then stood up, smirked, and said "oops." (T. at 166-167). Appellant then zipped up is pants and told L.P. to not immediately follow him down the stairs. (T. at 168).

{¶20} L.P. stated that she remained in the loft area for approximately five minutes to compose herself. (T. at 170). She testified that she then went down the stairs and directly to the bathroom to clean up. (T. at 174). L.P. stated that she cleaned the semen from her legs and also folded up toilet paper into her underwear because she was bleeding a little bit from the assault. (T. at 175). L.P. believed she was in the bathroom

for about ten minutes. (T. at 176-177). L.P. recalled that she then went to the kitchen area to retrieve her purse and keys. *Id.*

**{¶21}** L.P. recalled that Appellant and Demetrius were at the far end of the barn at that point. (T. at 178). She stated that she sat down at the corner of the bar and waited for an opportunity to leave without Appellant seeing her. (T. at 179). While sitting at the bar, L.P. testified she did not speak with anyone. (T. at 183). After about five minutes, L.P. attempted to leave, and Appellant met her at the exit door. (T. at 180). After a brief interaction, L.P. proceeded outside to her car. (T. at 181). L.P. testified that she drove away from the barn to a nearby intersection where she stopped and "googled" the location of the closest police station. (T. at 182). At 12:49 A.M., L.P. called 911 as she began to drive to the Powell police station. (T. at 184).

**{¶22}** Powell Police Officer Travis Dennison testified that on May 25, 2018, at approximately 1:00 a.m., he responded to a report of a sexual assault. (T. at 50). He testified that he made contact with the victim, L.P., and recalled that she was visibly upset and that he observed her crying and uncontrollably shaking. L.P. reported to him that she had been raped and that she had some bleeding from her vagina. (T. at 51). Officer Dennison observed red oval marks inside L.P.' s elbows, which he perceived to be thumbprint impressions. (T. at 57). L.P. indicated the perpetrator was possibly the husband of her friend, Keri. (T. at 55).

**{¶23}** Officer Dennison determined the location of the assault occurred within the jurisdiction of the Delaware County Sheriff and notified the Sheriff's office to take over the investigation. (T. at 53).

**{¶24}** Deputy Erica Ferrell of the Delaware County Sheriff's Office responded to the Powell Police Department to meet with L.P. (T. at 67). L.P. provided some additional details about the incident and reported the assault occurred at a fundraiser for her friend's daughter. *Id.* L.P. stated that the assault took place in the parking lot next to her car as she was leaving. *Id.*

**{¶25}** Deputy Ferrell then transported L.P. to Grady Memorial Hospital for a SANE exam. (T. at 70).

**{¶26}** Detective Chad Sloan with the Delaware County Sheriff's Office determined the incident address was 5939 Olentangy River Rd., which was a residence and a barn used as an event space. (T. at 554). Detective Sloan arrived to Grady Memorial Hospital at 2:36 A.M. where he met with Deputy Ferrell and L.P. (T. at 561). Detective Sloan recalled L.P. was still visibly upset when he met with her. (T. at 563). L.P. did not appear to him to be intoxicated. (T. at 567).

**{¶27}** While at the hospital, Detective Sloan attempted to get some basic information about the incident from L.P. (T. at 565). Detective Sloan learned L.P. was soon to be married, that she had been at a fundraiser earlier in the evening for the daughter of her friend, Keri Schmelmer, and that she was sexually assaulted as she was leaving the event. (T. at 565-566). Detective Sloan observed L.P. become extremely upset when he asked questions regarding Keri's husband, Erik Schmelmer. (T. at 574).

**{¶28}** Detective Sloan took custody of the SANE kit and concluded the initial interview with L.P. (T. at 573-574).

**{¶29}** Detective Sloan continued to investigate this matter through the early morning hours of May 25, 2018. (T. at 576). Detective Sloan learned from other Sheriff's

detectives that Appellant sent some unflattering text messages that morning to the property owner at 5939 Olentangy River Rd., Mr. Richard Briskey, in which he described having sex with L.P. (T. at 578).

{¶30} Detective Sloan called L.P. during the late morning of May 25, 2018, to follow up. (T. at 580). L.P. then named Appellant was the man who raped her. *Id.* L.P. denied the sexual conduct was consensual. *Id.*

{¶31} L.P. called Detective Sloan back shortly thereafter and informed him the sexual assault had occurred in the loft area inside the barn, not the parking lot as originally reported. (T. at 581-582). L.P. informed Detective Sloan she was pushed down into a sofa chair in the upstairs loft, and that was where the rape took place. *Id.*

{¶32} Detective Sloan obtained an arrest warrant for Appellant and arrested him later that day. (T. at 586-588).

{¶33} Nurse Amy Zoller testified as to her education and experience and then explained the SANE procedure. (T. at 496-505). She next described her recollection of performing the Sexual Assault Nurse Examination on the victim. She recalled that L.P. was visibly upset and crying. (T. at 505-506). She stated that the victim informed her that she had not had consensual intercourse within the last 96 hours. (T. at 508). She noted that she was told by L.P. that the assailant was one person, a white male, approximately 40 years old, and that he was a stranger. (T. at 509). L.P. informed her that vaginal penetration had occurred and that her assailant had ejaculated inside of her. (T. at 510). L.P. told Nurse Zoller that no digital penetration had occurred, that he did not use his mouth, that he did not bite her or use any foreign object to penetrate her. *Id.* When asked of the assailant had a weapon, L.P. stated "I don't think so." *Id.* When asked if restraints

were used, L.P. stated "Yes. He was pinning me to the car the whole time." (T. at 510-511). L.P. responded "No" when asked if the contraceptive spermicide, lubricant, or a condom was used. (T. at 511). When asked if the assailant was injured or bleeding, she stated "No". *Id.*

**{¶34}** Nurse Zoller then asked L.P. to provide details of the assault. She recalled that the victim again became tearful. (T. at 512). The victim then went on to recount that she was at a fundraising event for a friend's daughter, and that at some point during the evening her friend left the event. *Id.* She explained that she stayed because another woman at the event had been drinking a lot and she thought she might need a ride home because she had gotten into an argument earlier in the evening with her husband, *Id.* She stated she was concerned about leaving the woman there because she was the only other woman there. *Id.* She stated that all of the other guests at the event were middle-aged men, and that they were all friends of the woman's husband. *Id.*

**{¶35}** L.P. next told Nurse Zoller that someone brought cocaine to the event and that everyone, including the woman she was concerned about, starting using cocaine. *Id.* L.P. informed Nurse Zoller that she immediately gathered her belongings and headed out to her car. *Id.* She alleged that someone walked up behind her and that when she turned around, the man pushed her up against her car and instantly began having sex with her. (T. at 512-513). She stated "He put his penis in me. And it was over pretty quick. I was trying to push him off, saying, "You can't do this." (T. at 513). She explained that when it was over, she fell to the ground, and the man looked back at her as he was going back into the barn and told her "Drive safe." *Id.*

{¶36} Nurse Zoller than went on to describe the actual evidence she collected which included the victim's dress, the victim's underwear, oral swabs, vaginal swabs, fingernail swabs, pubic area swabs, and vaginal swab smears. (T. at 518). Nurse Zoller stated that no trauma was noted. *Id.* She stated that L.P. had tissue folded up in her underwear and explained that she had some bleeding following the assault. (T. at 519). She recalled that when she had L.P. place her feet in the stirrups for the exam, she again began crying. *Id.* She explained that the exam had to be paused and she again had to obtain consent from the victim before they could proceed with the exam. *Id.* Nurse Zoller explained that Toluidine blue dye, a nuclear reactant agent, was used which revealed an abrasion to the right posterior fourchette. (T. at 519-523). The victim also complained of tenderness to that area. (T. at 525). She recalled that the victim became hysterical upon use of the speculum, but that she was able to obtain internal swabs. No vaginal bleeding was noted. (T. at 524, 526). She explained that no assessment of the cervix was made due to poor tolerance of the victim. (T. at 520).

{¶37} Nurse Zoller's notes stated that "Patient was emotional throughout exam, withdrawn and sad appearing." (T. at 523-524). Once the exam was complete, the victim "was brought to the adjacent room to see mom and talk further with the detective. At this point, she became hysterical, sobbing, crying uncontrollably." (T. at 524).

{¶38} Upon inquiry, Nurse Zoller explained that it is possible for a woman to be sexually assaulted and not present with any injuries. (T. at 528). Ms. Zoller stated that in this case, based on her training and experience, L.P.'s injury could be consistent with her description of being forcibly penetrated. (T. at 528-529).

{¶39} James Meininger testified that he was in jail with Appellant after his arrest and that they spoke a few times. (T. at 359). Mr. Meininger stated that during these conversations, which took place over the course of three days, Appellant described to him how he forcefully had sex with a woman, and that he was in jail because he was charged with raping her. (T. at 360). He recounted how Appellant told him that he was at a fundraiser for his daughter and that the event was held in a barn. (T. at 361). Appellant told him that after his wife left, he followed a girl upstairs and that he started kissing her and fondling her but that she did not want it, so he put his hand over her mouth so no one could hear her downstairs and he forcefully had sex with her. (T. at 361-363). Meininger recalled that Appellant "went to the great detail telling me he finished inside of her." (T. at 363). Meininger stated that Appellant's actual words were that he "nutted in her". *Id.* Appellant specifically told Meininger that the girl said "No". (T. at 362). Appellant told Meininger that the girl was Miss Oklahoma. *Id.* Meininger described Appellant as cocky and arrogant. (T. at 363). Meininger described Appellant's description of the events as "bragging". (T. at 365). Appellant told him that he was not worried about the charges, that would get off because the girl was so drunk she would not remember what happened. (T. at 363). He claimed that he had already spoken to his friends, who were football players, big shots, and high rollers, whom he described as "ballers", and that they all had his back. (T. at 363, 369-370).

{¶40} Meininger testified that it was Appellant's description of how he put his hand over the girl's mouth that made him say something to the guards in the jail. *Id.* Meininger then told Detective Sloan about his conversations with Appellant. (T. at 364).

**{¶41}** Meininger testified that no promises or threats were made in exchange for his testimony. (T. at 359).

**{¶42}** Keri Schmelmer testified as to her close friend/mentor relationship with L.P. She recalled that the two of them had lunch together and got dressed for the party together. (T. at 385-386). She stated that she never observed L.P. drinking any alcohol that evening. (T. at 390-391). She testified that on the night of the fundraiser she only observed one close interaction between L.P. and Appellant, where L.P. leaned her elbow on Appellant's shoulder. (T. at 398-400). She stated that she was annoyed by this but clarified that by this point in the evening she was already tired and annoyed, mostly because she was sober and the other partygoers were not. (Tat 398, 402-403, 409). She further testified that she became further annoyed when Appellant began talking about going to a strip club and then began singing along to a song with vulgar lyrics. (T. at 406-408). She explained that she and Appellant had been communicating through texts that evening and that she had communicated her annoyance with him and informed him around 11:50 pm that she was leaving and going home. (T. at 408-410). She stated that he tried to stop her from leaving by following her out to her car and reaching in through the driver's side window in an attempt to remove the keys from the ignition. (T. at 411-414). Instead, he broke off the lever for the windshield wipers. (T. at 413-414). She stated that this made her even more angry and she left and went home. (T. at 414-415).

**{¶43}** Richard Briskey testified that he is the owner of the barn and property where the fundraising event was held. (T. at 458-459). He stated that he and Appellant were casual friends. (T. at 466). He testified that on the morning after the event Appellant sent text messages about how he "banged that chick in the yellow dress." (T. at 480). Briskey

responded with a text "Hey, where did you bang that chick? Did you make a mess again?" (T. at 482). Appellant responded "Upstairs. No, I was sure not to", to which Briskey replied "good boy." (T. at 482-483). Appellant then texted "HaHa. Dumped right in her or [for] good show" and followed up with "Hope she doesn't get pregnant before her wedding." (T. at 483). Briskey stated that he also had telephone conversations with Appellant the same time wherein Appellant told him about having sex with the girl in the yellow dress. (T. at 484). Briskey testified that he provided the text messages to the detectives investigating the matter. (T. at 485).

{¶44} At the close of the State's evidence, the court denied the Rule 29 motion made by the defense. (T. at 662-667).

{¶45} Eric Pullins testified he and Appellant were casual friends and that he was at the party earlier in the evening, that he left and then returned around 11:00 – 11:30 pm. (T. at 673, 675-676). He recounted that Appellant told him that night that he had sex with L.P. (T. at 677, 679). He testified that he observed L.P. at the party afterwards and she did not appear to be emotional or upset. (T. at 680-682).

{¶46} Norman (Dee) Miller testified that he and Appellant were "really good friends" and that he was also at the party on May 24th. (T. at 703-704). He recalled that he spoke with L.P. prior to her leaving and that he did not observe anything abnormal in her demeanor. (T. at 711-713, 715, 719). He admitted on cross-examination that it was possible that his conversation with her could have been earlier in the night and that he may have thought she left around the time Keri Schmelmer left. (T. at 740).  He also testified that he saw Appellant use cocaine at the party. (T. at 736).

**{¶47}** William Christian testified that he is a good friend of Appellant's and was at the event on May 24th. (T. at 753). He recalled seeing L.P. arm-in-arm with Appellant, with her head resting on his chest. (T. at 754). He stated that the interaction probably lasted a few seconds. (T. at 755). He testified that he left the party around 11:00 or 11:30 pm. (T. at 758, 761).

**{¶48}** Elizabeth Vaughn and Kenneth Vaughn both testified that they were good friends with Appellant and Keri Schmelmer and that they attended the fundraising event. Elizabeth Vaughn recalled the argument between Appellant and Keri. (T. at 770). She denied seeing anyone at the party using cocaine or other drugs. (T. at 773, 778-780).

**{¶49}** Kenneth Vaughn testified that he did not recall the argument between Appellant and Keri Schmelmer in the parking lot. (T. at 842-844). He stated that he did not remember having an argument with his own wife that night. (T. at 844, 846). He stated that he did not remember sending texts to Appellant the following morning. (T. at 847). He testified that he remembered seeing L.P. come down from the loft area and that she was smiling. (T. at 835). He testified that she did not appear distraught or upset. (T. at 838).

**{¶50}** Demetrius Bradley testified that he and Appellant had been good friends for about five years. (T. at 784). He recalled being at the fundraiser and remembered speaking with L.P. (T. at 795). He stated that the two of them exchanged telephone numbers. (T. at 795-796). He recalled that later, as he was headed outside to smoke a cigar, he saw L.P. as she was walking down the steps from the loft and she smiled at him. (T. at 791, 802, 808). He testified that her demeanor did not seem any different than it was earlier in the evening. (T. at 794, 802).

**{¶51}** After being advised of his rights, Appellant Erik Schmelmer testified as to his version of the events that transpired that night. He recalled the argument he and Keri Schmelmer had that night and the altercation in the parking lot. (T. at 877-878, 880-885). He stated that earlier in the evening he had taken one of Keri's prescription Adderall but denied using cocaine or any other drugs that evening (T. at 888-893). He testified that at some point, later in the evening after Keri left, L.P. told him that she was cold and asked him to turn up the heat. (T. at 894). He told her that he would, that the thermostat was upstairs and he would be right back. *Id.* He stated that he went upstairs and was adjusting the thermostat when he heard footsteps and turned and saw that she had followed him upstairs. (T. at 895). He testified that the two of them "immediately start making out." (T. at 896). He further described that the two were "tongue kissing for probably a minute or so". (T. at 896). He stated that he then took his "hand and started rubbing the outside of her jumper and underwear. (T. at 897). He testified that he "eventually was putting [his] hand inside of her underwear and [he] was playing with her clitoris." *Id.* He stated that this all happened while the two were standing. *Id.* He testified that the two then slowly moved toward the chair and couch. (T. at 898). He stated that L.P. then sat back on one of the chairs. (T. at 899-901). He testified that they kissed for a few more minutes and then he "pulled her jumper …and panties to the side, and [he] performed oral sex on her" for approximately two to three minutes. (T. at 901). He testified that L.P. then said "'Fuck me' three times in a row." (T. at 903-904). He stated that he then unzipped his pants, pulled down his pants and his underwear. (T. at 904-905). He then stated "I was holding the panties and the shorts still to the side, and I just leaned forward and put my penis inside of her" and had sexual intercourse. (T. at 905).

He stated that the intercourse lasted a couple of minutes and that he would not describe it as rough or aggressive at all. (T. at 910). He denied spitting in his hand at any time. *Id.* He stated that L.P. did not tell him to stop, did not say "No", did not try to push him off of her, or do anything to lead him to believe that she did not consent. (T. at 906-907, 911-912). He denied laying on top of her and further denied his elbow or forearm on her chest. (T. at 910). He stated that at no point did L.P. ever say "No" or attempt to push him away but that she did say "Keri's going to kill us." (T. at 902). He stated that he asked her if he could ejaculate inside of her and she said yes. (T. at 912). He stated that he then immediately began getting dressed, and told L.P. that he did not think it was a good idea for the two of them to go back downstairs at the same time because Keri's friend Liz might see them together. (T. at 913). He stated that he went down the stairs and then went outside for a few minutes and then came back inside through a different door. (T. at 914).

{¶52} He testified that when he came back into the barn, L.P. was standing in the bar area talking with Dee and Demetrius. (T. at 915-916). He testified that when he walked by Demetrius he told him "I just fucked her." (T. at 916). He also told Eric Pullins "I had sex with yellow." (T. at 925). He testified that at that time L.P.'s demeanor had not changed and that she was still smiling and "bubbly' like she had been all evening. (T. at 917-918). He testified that L.P. stayed for approximately another 30-45 minutes before she said she was going home and that she was going to drive to South Vienna and stay with her parents. (T. at 922). He stated that he told her to drive safely and to message him on FaceBook so that he would know she made it home okay. (T. at 923). He stated

that it was around 1:00 am when she left. *Id.* He stated that he messaged her around 3:00 am to check on her but received no response. (T. at 924).

{¶53} Appellant admitted that he texted a couple of other people to tell them that he had sex with L.P. (T. at 925). He admits that he was "bragging" and that it was "completely shitty." (T. at 926).

{¶54} On October 22, 2020, the court returned verdicts of guilty on both counts in the Indictment, as reflected in a Judgment Entry filed on October 22, 2020.

{¶55} On October 28, 2020, the trial court held a sentencing hearing. The court merged the two counts in the Indictment and imposed a five-year mandatory prison term. Pursuant to R.C. §2950, the court classified Appellant as Tier III sexual offender and imposed sanctions and restrictions in accordance with that classification. The court declined to impose a fine but ordered Appellant to pay court costs, enforceable after his term of incarceration.

{¶56} Appellant now appeals, assigning the following errors for review:

**ASSIGNMENTS OF ERROR**

{¶57} "I. THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶58} "II. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTIONS, IN VIOLATION OF DUE PROCESS AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶59}** "III. THE TRIAL COURT IMPROPERLY EXCLUDED DEFENSE EVIDENCE THAT NEGATED *MENS REA*, CORROBORATED THE DEFENSE, AND DIRECTLY CONTRADICTED THE TESTIMONY OF THE ALLEGED VICTIM. THE COURT THEREBY VIOLATED THE RULES OF EVIDENCE, DEPRIVED APPELLANT OF DUE PROCESS OF LAW, AND VIOLATED HIS RIGHTS TO PRESENT A MEANINGFUL DEFENSE, TO COMPULSORY PROCESS, AND TO CONFRONT HIS ACCUSERS AS GUARANTEED (SIC) SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶60}** "IV. THE TRIAL COURT ERRED BY ADMITTING IMPROPER HEARSAY EVIDENCE IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHTS OF CONFRONTATION AND TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶61}** "V. THE TRIAL COURT ERRORED (SIC) BY ADMITTING IMPROPER TESTIMONY VOUCHING FOR THE VERACITY AND CREDIBILITY OF KEY WITNESSES IN VIOLATION OF THE RULES OF EVIDENCE AND APPELLANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

**{¶62}** "VI. OHIO'S RAPE SHIELD STATUTE, AS APPLIED IN THIS CASE, DEPRIVED APPELLANT OF HIS RIGHTS TO CONFONTRATION, COMPULSORY PROCESS, AND TO PRESENT A MEANINGFUL DEFENSE AS GUARANTEED BY

THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶63} "VII. THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING EXPERT TESTIMONY FROM AN UNQUALIFIED WITNESS IN VIOLATION THE RULES OF EVIDENCE AND OHIO CRIMINAL RULE 16(K); THEREBY DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶64} "VIII. THE PROSECUTOR'S IMPROPER QUESTIONING REGARDING APPELLANT'S EXERCISE OF HIS RIGHT TO REMAIN SILENT AND CHARACTER, AND CLOSING ARGUMENT, CONSTITUTED PROSECUTORIAL MISCONDUCT AND DEPRIVED APPELLANT OF A FAIR TRIAL, IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶65} "IX. TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO IMPERMISSIBLE QUESTIONING AND ARGUMENT BY THE STATE, IN VIOLATION OF DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION."

**I., II.**

**{¶66}** In his first and second assignments of error, Appellant argues that his conviction is against the manifest weight and sufficiency of the evidence. We disagree.

**{¶67}** The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

**{¶68}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins, supra*, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the

evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶69}** In the instant case, Appellant was convicted of Rape, pursuant to R.C. §2907.02(A)(1)(c), and Kidnapping, pursuant to R.C. §2905.01(A)(4), which provide in relevant part:

**R.C. §2907.02 <u>RAPE</u>**

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

\*\*\*

(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

**R.C. §2905.01 <u>KIDNAPPING</u>**

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

\*\*\*

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;

*\*\**

{¶70}  Initially, we note Appellant does not dispute the fact he engaged in sexual activity with L.P. Rather, Appellant argues, the primary issue at trial was whether the encounter was consensual.

{¶71} Specifically, Appellant herein argues that the state failed to prove that he "purposely" compelled L.P. to submit to sex by "force or threat of force" and further failed to prove that he "purposely" used "force, threat, or deception" to "restrain" L.P.'s "liberty".

{¶72}  R.C. §2901.22(A) states:

A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

{¶73} In addressing the force-or-threat-of-force language under the rape and statute, the Supreme Court of Ohio clarified that "[a] defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus.

{¶74} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. §2901.01(A)(1). A victim "need not prove physical resistance to the offender" in order to demonstrate force. R.C. 2907.05(D).

**{¶75}** " '[T]he amount of force [necessary to prove forcible rape under R.C. §2907.02(A)(2)] must be examined in light of the circumstances.' " *Stevens* at ¶ 21, quoting *State v. Runyons*, 3d Dist. Union No. 14–91–30, 1992 WL 136196, (June 9, 1992). "The Supreme Court of Ohio 'case law demonstrates that the type and amount of force necessary to purposefully compel a victim to submit by "force or threat of force" depends upon the victim and the offender's relationship.' " *Id.*, quoting *State v. Wine*, 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, 2012 WL 2371396, ¶ 41, citing *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, 2004 WL 2600461, ¶ 12. The amount of force necessary " 'depends upon the age, size and strength of the parties and their relation to each other.' " *In re Forbess*, 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, 2010 WL 2488064, ¶ 40, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus.

**{¶76}** As set forth above, the trial court heard testimony from Officer Travis Dennison, Deputy Erica Ferrell, Detective Kevin Ullom, jailhouse informant James Meininger, Keri Schmelmer, Richard Briskey, owner of the barn, SANE nurse Amy Zoller, and Detective Chad Sloan. The court also heard testimony from the victim, L.P. and her description of what took place that evening and whether or not she consented to have sexual intercourse with Appellant.

**{¶77}** The court also heard testimony from Eric Pullins, Norman Douglas (Dee) Miller, Jr., William Christian, Elizabeth Vaughan, Demetrius Bradley, and Kenny Vaughan, all friends and/or acquaintances of Appellant, who were present at the fundraising event on the night in question. Finally, the trial court heard testimony from

Appellant, wherein he provided his version of the what took place between L.P. and himself.

**{¶78}** Appellant argues that L.P. was not credible because she initially made false statements to police and the SANE nurse and further argued that she had a motive to lie in not wanting to damage her relationship with her friend, Appellant's ex-wife.

**{¶79}** Notwithstanding Appellant's arguments, based on the specific facts and circumstances of this case, we conclude that the trial court's conclusion that Appellant purposefully compelled L.P. to submit to sexual conduct by force or threat of force is not against the manifest weight or sufficiency of the evidence. Ultimately, this case turned on whether the trial court believed L.P.'s or Appellant's version of events. "Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections - observations that are critical to determining a witness's credibility." *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, 2013 WL 658155, ¶ 31, citing *State v. Clark,* 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, 2010 WL 3591605, ¶ 17, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996) and *State v. Antill*, 176 Ohio St. 61, 66, 197 N.E.2d 548 (1964).

**{¶80}** Here, the trier of fact was free to accept or reject any or all of L.P.'s testimony and decided to accept her testimony that she did not consent to sexual conduct with Appellant. *See Id.*, citing *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, 2010 WL 3353606, ¶ 16. *See also In re Forbess* at ¶ 42 (concluding that it was not

unreasonable for the trial court to believe the victim's testimony over the defendant's protest that the sexual encounter was consensual).

**{¶81}** We are mindful, moreover, that "[c]orroboration of victim testimony in rape cases is not required." *State v. Meeks*, 5th Dist. No. 2014CA00017, 2015-Ohio-1527, 34 N.E.3d 382, ¶ 81, appeal not allowed, 143 Ohio St.3d 1543, 2015-Ohio-4633, 40 N.E.3d 1180, citing *State v. Cuthbert,* 5th Dist. Delaware No. 11CAA070065, 2012-Ohio-4472, 2012 WL 4474720, ¶ 28 and *State v. Johnson,* 112 Ohio St.3d 210–217, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 53.

**{¶82}** Upon review, we decline to second-guess the credibility determinations the trier of fact made following the bench trial in this matter. The trial court heard the victim testify about Appellant's use of force. In addition to the testimony of the state's witnesses, there was other evidence of injury as testified to by the SANE nurse, consistent with the state's theory of the case. The trial court also heard the testimony of Appellant, and the court was in the best position to evaluate his credibility.

**{¶83}** Based on the record, we find Appellant's convictions of kidnapping and rape are supported by sufficient evidence.

**{¶84}** We further find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. The court neither lost its way nor created a miscarriage of justice in convicting Appellant of rape and kidnapping, and Appellee presented evidence of his guilt beyond a reasonable doubt.

**{¶85}** Appellant's first and second assignments of error are overruled.

**III., VI.**

{¶86} In his third and sixth assignments of error, Appellant argues the trial court erred in excluding evidence and in applying the "Rape Shield" statute in this case. We disagree.

{¶87} Appellant argues that evidence critical to his defense was improperly excluded by the trial court.

{¶88} All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible. Evid.R. 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Under Evid.R. 403(A), '[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.' " *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, 2014 WL 1692753, ¶ 122, quoting *State v. Maag*, 3d Dist. Hancock Nos. 5–03–32 and 5-03-33, 2005-Ohio-3761, 2005 WL 1712898, ¶ 71.

{¶89} "Evid.R. 403(A) does not 'attempt to bar all prejudicial evidence.' " *State v. Scurlock*, 6th Dist. Lucas No. L-5-1200, 2017-Ohio-1219, 2017 WL 1193825, ¶ 32, quoting *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23.

"Instead, the rule provides that only *unfairly* prejudicial evidence is excludable." (Emphasis sic.) *Id.*, citing *Crotts* at ¶ 23.

**{¶90}** " 'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' " *Crotts* at ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 171, 743 N.E.2d 890 (2001), quoting Weissenberger, *Ohio Evidence*, Section 403.3, at 85–87 (2000). *See also Velez* at ¶ 122, quoting *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, 2012 WL 929707, ¶ 82.

**{¶91}** Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion and material prejudice. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). An abuse of discretion implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). However, "if the party wishing to exclude evidence fails to contemporaneously object at trial when the evidence is presented, that party waives for appeal all but plain error." *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, 2014 WL 1692720, ¶ 53–54, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 59–60, *State v. Barrett*, 4th Dist. Scioto No. 03CA2889, 2004-Ohio-2064, 2004 WL 878002, ¶ 20, and *State v. Lenoir*, 2d Dist. Montgomery No. 22239, 2008-Ohio-1984, 2008 WL 1838352, ¶ 19.

**{¶92}** Evid.R. 608(B) generally precludes the admission of extrinsic evidence of specific conduct of a witness that is submitted for the purpose of challenging the witness' character for truthfulness.

**{¶93}** Here, Appellant sought to introduce the following: additional testimony about the strip club conversation and L.P.'s desire to go and her offer to dance at the club for Appellant; additional testimony from Dee Miller explaining that the reason he had a conversation with L.P. about her upcoming marriage was because of her flirtatious and inappropriate behavior with Appellant and others that evening;  and, additional testimony from Kenneth Vaughn about how L.P. was behaving too flirtatious with the men at the party, how he warned others at the party to stay away from L.P. because of the way she was behaving, and statements he made to his wife about his belief that Appellant and L.P. had "just had sex."

**{¶94}** To assess the probative value of the excluded evidence, it is necessary to examine its relevance to the issues for which it was offered. *Id.* Here, the excluded evidence was intended to demonstrate that the victim was acting flirtatiously with other men at the event, how other party-goers were offended by her conduct and how some of the people present thought the victim was a hired stripper. Appellant's memorandum filed with the court to give context to the intended testimony stated: "the anticipated testimony of defendant's witnesses seeks to show the behavior of L.P. on the night in question. Such testimony will prove L.P. did everything to imply that she was willing to engage in sexual behavior."

**{¶95}** Upon review, we find the excluded evidence lacked probative value. The opinion of others at the party as to the victim's dress and her behavior did not go to any

of the elements of the offenses charged, i.e. force, consent, or Appellant's state of mind. Moreover, the excluded evidence was oriented exclusively toward showing that L.P. was acting provocatively toward other men that evening. What the victim was wearing and what she was doing with people other than the Appellant have no bearing on whether the sexual activity between Appellant and the victim was consensual or constituted forcible rape.

{¶96} Further, Appellant was free to cross-examine L.P. about her dress, her behavior, and her upcoming wedding.

{¶97} Appellant also sought to introduce testimony that L.P. engaged in sexual activity with another person at the party that evening and evidence that an unknown male's DNA was found in L.P.s underwear.

{¶98} Ohio's "Rape Shield" law, R.C. §2907.02(D) prohibits:

Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity * * * unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender.

{¶99} Sexual activity is defined as sexual conduct or sexual contact or both. R.C. §2907.01(C). Sexual conduct includes vaginal intercourse, anal intercourse, fellatio, and cunnilingus. R.C. §2907.01(A). Sexual contact includes any touching of an erogenous zone of another for the purpose of sexually arousing or gratifying either person. R.C. §2907.01(B).

**{¶100}** Rape shield laws were enacted to prohibit extremely inflammatory and prejudicial evidence that is only marginally probative. *State v. Cotton* (1996), 113 Ohio App.3d 125, 680 N.E.2d 657, citing *State v. Gardner* (1979), 59 Ohio St.2d 14, 391 N.E.2d 337. In *In re Johnson* (1989), 61 Ohio App.3d 544, 573 N.E.2d 184, the court held that testimony regarding the complaining witness' physical attractions to and sexual desires regarding the defendant were improperly excluded under the rape shield statute, as the "desires" of the alleged victim were not included in the definition of sexual activity. *Id.*

**{¶101}** Ohio's "Rape Shield" law prohibits the admission of evidence concerning a victim's sexual activity except in some narrow circumstances. R.C. §2907.02(D). Necessarily, any restriction on a defendant's ability to cross-examine an accuser could impede due process rights.

**{¶102}** However, a defendant's due process rights must be balanced against the state's interest in the rape shield law. *State v. Hart,* 112 Ohio App.3d 327, 331, 678 N.E.2d 952 (12th Dist.1996). To determine whether the rape shield law was unconstitutionally applied, the state's interest must be balanced against the probative value of the excluded evidence. *Id.* at 331–332, 678 N.E.2d 952. Legitimate state interests include guarding the victim's privacy, preventing the victim from undue harassment, and discouraging the tendency in rape cases to try the victim rather than the defendant. *Id.* at 332, 678 N.E.2d 952.

**{¶103}** Upon review, we find that the testimony and evidence was properly excluded. Evidence that L.P. may have engaged in sexual activity with someone else

cannot be used to show consent to sexual conduct with Appellant. There is no probative basis to admit the victim's sexual activity with a third party. R.C. §2907.02(D).

**{¶104}** Consequently, an as-applied challenge to the rape shield law lacks merit.

**{¶105}** Appellant's third and sixth assignments of error are overruled.

### IV., V.

**{¶106}** In his fourth and fifth assignments of error, Appellant argues that statements made by Detective Sloan were improperly admitted. We disagree.

**{¶107}** Specifically, Appellant argues two statements made by Det. Sloan regarding his telephone conversation with L.P. constituted inadmissible hearsay, that he vouched for L.P.'s and James Meininger's credibility, and that he offered impermissible expert opinion regarding L.P.'s delay in naming Appellant as her assailant.

**{¶108}** Initially we note that defense counsel did not object to the statements and arguments now being challenged. We therefore review only for plain error. *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), the Supreme Court of Ohio instructed:

**{¶109}** By its very terms, [Crim.R. 52(B)] places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial

rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.

**{¶110}** Under Crim.R. 52(B), the defendant bears the burden of demonstrating that a plain error affected his substantial rights. But even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to "prevent a manifest miscarriage of justice." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.

**{¶111}** Appellant argues that the detective's testimony about statements made to him by L.P. that sex with Appellant was not consensual and that she told him "[s]he had been pushed onto a chair that was in the upstairs loft and that's where the sexual conduct took place were hearsay and should not have been admitted." (T. at 580-581).

**{¶112}** Upon review, we find the testimony was admissible on the grounds that it was not being offered for the truth of the matter asserted and was only offered to explain what happened procedurally during the investigation.

**{¶113}** "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980) (finding the officers' testimony on their receipt of a tip about a gambling operation in the town was not hearsay as it was offered to explain the subsequent investigative activities of the witnesses and was not offered to prove the truth of the matter asserted). Therefore, "[a] law-enforcement officer may testify about a declarant's out-of-court statement for the nonhearsay purpose of explaining the next investigative step." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 136. *See also State v.*

*Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 117 (the detective's testimony stating the defendant became a suspect in the murder after the police received a tip was not hearsay).

**{¶114}** We further find, that even if said statements were inadmissible hearsay, any such error was harmless beyond a reasonable doubt in that the fact that sexual activity took place between L.P. and Appellant in the loft, on the chair, is not disputed. The only issue is consent. Further, the victim herself testified as to such events.

**{¶115}** Appellant also argues that Detective Sloan improperly bolstered the credibility of the victim and James Meininger, the jailhouse informant.

**{¶116}** Upon review, we do not find that the detective's statements were used to corroborate the victim's testimony, only to explain the steps in his investigation. We further find that his affirmative answer to the question as to whether he had heard the victim's testimony and whether it was more or less accurate to what he recalled from his conversation with L.P. during his second telephone call with her does not amount to improper vouching. He did not state that she was being truthful or telling the truth, only that he found her testimony to be consistent with her earlier statements to him.

**{¶117}** Similarly, Det. Sloan's testimony concerning James Meininger merely indicated the witness' testimony presented, in court, was consistent with his prior statements. (T. at 593).

**{¶118}** Finally, Appellant objects to Detective Sloan's response of "No" to the question "When you investigate crimes where people have been assaulted by people they know, do they always immediately point to that person?" (T. at 574).

**{¶119}** A lay witness is permitted to give opinion testimony under Evid.R. 701, which states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**{¶120}** Upon review, we find that said answer was based on Det. Sloan's personal experience as a police officer. He was not asked to give a psychological opinion or assessment, nor did he improperly give one.

**{¶121}** Appellant's fourth and fifth assignments of error are overruled.

**VII.**

**{¶122}** In his seventh assignment of error, Appellant argues that the testimony of the SANE nurse was improperly admitted. We disagree.

**{¶123}** Appellant argues that SANE nurse Amy Zoller's provided expert opinions or conclusions as to what caused L.P.'s injuries and that her testimony was therefore improperly admitted. Again, we note that said testimony was admitted without objection and is therefore subject to a plain error analysis as set forth above.

**{¶124}** Again, as set forth above, a lay witness is permitted to give opinion testimony under Evid.R. 701.

**{¶125}** Further, statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for the purposes of medical

diagnosis and treatment. *See State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834.

**{¶126}** Information provided about "the identity of the perpetrator, the age of the perpetrator, the type of abuse alleged, and the time frame of the abuse" were all for medical diagnosis. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 32. *See also State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1.

**{¶127}** Upon review, we find that Nurse Zoller only testified as to her observations and findings made during the medical exam. She did not provide an opinion as to what caused L.P.'s injuries.

**{¶128}** Appellant further argues that Nurse Zoller vouched for L.P.'s credibility when she testified that her medical findings and L.P.'s ' narrative of what occurred, during the sexual assault, were consistent. We disagree with this conclusion. Nurse Zoller did not testify that L.P. was credible or truthful. Zoller merely testified that L.P.'s statements to her were consistent with her medical findings. *State v. Keeton*, 5th Dist. Richland No. 03 CA 43, 2004-Ohio-3676, ¶ 124

**{¶129}** Based on the foregoing, we find no error, plain or otherwise, in the admission of Nurse Zoller's testimony.

**{¶130}** Appellant's seventh assignment of error is overruled.

**VIII.**

**{¶131}** In his eighth assignment of error, Appellant alleges prosecutorial misconduct which deprived him of a fair trial. We disagree.

**{¶132}** The crux of Appellant's prosecutorial misconduct argument relates to the following exchange during which Appellant argues that the prosecutor elicited testimony about Appellant's silence following his arrest:

Q: And when you first meet with him, did you try to question him first?

A. I did not.

Q: What did you do?

A: I Mirandized him; made sure he understood his rights and informed him that he had an arrest warrant."

Q: Okay. Did you place him under arrest?

A: Yes.

Q: What was his reaction when you placed him under arrest?

A: He was upset. He was emotional.

Q: Did he make any statements at that time?

A: Nothing specific that I can recall. He had made requests; wanted to place a couple of phone calls, which we certainly granted.

Q: There was no conversation about what may have happened between him and [L.P.] is my point?

A: No, not that I can recall.

**{¶133}** (T. at 588-589).

**{¶134}** Again, no objections were raised to the prosecutor's comments. As stated above, in criminal cases where an objection is not raised at the trial court level, we review under a "plain error" standard.

{¶135}  Upon review, we do not find that the above line of questioning elicited or was an attempt to elicit responses or comments on Appellant invoking his right to remain silent or his right to counsel.

{¶136}  Appellant also argues that the prosecutor engaged in "character and personality attacks" on Appellant, commenting on his landscaping business, attempting to show that he had financial problems and that he enjoyed befriending wealthy people.

{¶137}  Evid.R. 607, which allows for impeachment of a witness, provides:

(A) Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803.

(B) Impeachment: Reasonable Basis. A questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact.

{¶138}  Evid.R. 608, Evidence of character and conduct of witness, provides:

(A) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for

truthfulness has been attacked by opinion or reputation evidence or otherwise.

**{¶139}** The prosecutor's questions to Appellant on cross-examination sought to establish that Appellant was in debt and not financially stable, and that he lied to co-workers, customers, friends and his ex-wife. As such, we do not find that such line of questioning falls outside of the parameters of Evid.R. 607 and/or 608. We therefore do not find that such constituted misconduct resulting in Appellant being denied a fair trial.

**{¶140}** Appellant has therefore failed to meet his burden of demonstrating prosecutorial misconduct.

**{¶141}** Appellant's eighth assignment of error is overruled.

**IX**.

**{¶142}** In his ninth and final assignment of error, Appellant argues that he was denied the effective assistance of counsel. We disagree.

**{¶143}** A properly licensed attorney is presumed competent. *State v. Hamblin*, 37 Ohio St.3d 153, 524 N.E.2d 476 (1988). A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306, 750 N.E.2d 148 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687, 104 S.Ct. 2052. Counsel is entitled to a strong

presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141–42, 538 N.E.2d 373 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396, 358 N.E.2d 623 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

**{¶144}**  "Prejudice results when 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Liles*, 3d Dist. Allen No. 1-13-04, 2014-Ohio-259, 2014 WL 296002, ¶ 48, quoting *Bradley* at 142, 538 N.E.2d 373, citing *Strickland* at 691, 104 S.Ct. 2052. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, quoting *Bradley* at 142, 538 N.E.2d 373 and citing *Strickland* at 694, 104 S.Ct. 2052.

**{¶145}**  Appellant herein maintains trial counsel was ineffective for failing to object to the statements made by Detective Sloan as set forth in his Fourth and Fifth Assignments of Error and the prosecutor's line of questioning as set forth in Assignment of Error Eight.

**{¶146}** For the reasons discussed in addressing the previous assignments of error, we find Appellant's claim to be without merit, and counsel cannot be deficient for failing to raise a meritless claim.

**{¶147}**  Appellant's ninth assignment of error is overruled.

**{¶148}**  For the forgoing reasons, the judgment of the Court of Common Pleas of Delaware County, Ohio, is affirmed.

By: Wise, J.,

Delaney, J., concurs.

Hoffman, P.J., concurs separately.

JWW/kw 0103

*Hoffman, P.J., concurring*

{¶149}  I concur in the majority's analysis and disposition of Appellant's first and second assignments of error.

{¶150}  I concur in the majority's disposition of Appellant's third and sixth assignments of error.  My reasons follow.

{¶151}  The majority concludes the excluded evidence the victim was acting flirtatiously at the event lacked probative value.  I disagree.  I think it is probative on the issue of both consent and Appellant's state of mind.  However, while probative, that does not automatically mean it was admissible.  I would find the trial court's decision to exclude such evidence was not an abuse of discretion under Evid.R. 403(A), in that the probative value of this evidence was substantially outweighed by the danger of its unfair prejudice.

{¶152}  As to the excluded evidence regarding L.P.'s alleged sexual activity with another person at the event, I concur in the majority's analysis and decision such testimony was properly excluded under Ohio's "Rape Shield" law.

{¶153}  I concur in the majority's analysis and disposition of Appellant's fourth, fifth, and seventh assignments of error.

{¶154}  As to Appellant's eighth assignment of error asserting prosecutorial misconduct, I agree with the majority the alleged misconduct does not raise to the level of plain error.  While the prosecutor may not have intended nor attempted to elicit comments on Appellant invoking his right to remain silent or his right to counsel, I find the prosecutor did so.  However, I find such indirect reference to Appellant's silence harmless beyond a reasonable doubt.

**{¶155}** I respectfully disagree with the majority's conclusion the prosecutor's attack on Appellant's character and personality regarding his landscaping business, financial problems, and that he enjoyed befriending wealthy people was admissible under Evid.R. 608.  However, although I disagree, I find the admission of such evidence harmless.

**{¶156}**   Finally, as to Appellant's ninth assignment of error, I would overrule the same according to my analysis of Appellant's fourth and fifth assignments of error based upon the second prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1994).